# Exhibit 1

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Ave., 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
         lrosen@rosenlegal.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MATTHEW WHITE, Individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> NANO-X IMAGING LTD., RAN POLIAKINE, and ITZHAK MAAYAN, <br><br> Defendants. | Case No. <br><br> CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS <br><br> <u>JURY TRIAL DEMANDED</u> <br><br> <u>CLASS ACTION</u> |

Plaintiff Matthew White ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the defendants' public documents, and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Nano-X Imaging Ltd. ("Nano-X" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.

1

Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of all persons and entities who purchased the publicly traded securities of Nano-X between August 21, 2020 and September 15, 2020, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

3.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

4.     Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements entered and subsequent damages took place within this judicial district.

5.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6. Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Nano-X's securities during the Class Period and was economically damaged thereby.

7. Defendant Nano-X purportedly develops and produces x-ray source technology for the medical imaging industry. The Company is incorporated in Israel with its principal executive offices located at Communications Center, Neve Ilan, Israel, 9085000. The Company's securities are traded on NASDAQ under the ticker symbol "NNOX."

8. Defendant Ran Poliakine ("Poliakine") has served as Nano-X's Chief Executive Officer and a Director of the Company throughout the Class Period.

9. Defendant Itzhak Maayan ("Maayan") has served as Nano-X's Chief Financial Officer throughout the Class Period.

10. Defendants Poliakine and Maayan are sometimes referred to herein as the "Individual Defendants."

11. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

3

(e)  was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)  was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)  approved or ratified these statements in violation of the federal securities laws.

12.  The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

13.  The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

14.  The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

**SUBSTANTIVE ALLEGATIONS**

**Background**

15.  The Company's x-ray imaging solution is called the "Nanox System." The Nanox System includes two integrated components – hardware ("Nanox.ARC") and software ("Nanox.CLOUD"). The Nanox.ARC has not been approved by regulators. The Nanox System is purportedly designed to enable medical screening as a service ("MSaaS") to improve accessibility and affordability of early-detection.

16.  On July 30, 2020, Nano-X filed a Registration Statement on Form F-1 with the SEC. Following subsequent amendments, the Registration Statement was declared effective on August 20, 2020. Defendants Poliakine and Maayan signed the Registration Statement.

17.  Nano-X securities began trading on NASDAQ on August 21, 2020.

18.     On August 25, 2020, Nano-X filed its final prospectus, which incorporated and formed part of the final Registration Statement, with the SEC on Form 424B4.

## Materially False and Misleading Statements

19.     The Registration Statement, signed by the Individual Defendants, discussed the Company's commercial agreements with customers, stating in part:

### MSaaS Agreements

**We have entered into eight MSaaS Agreements to deploy 4,520 Nanox Systems in eleven regions as described in the table below.** Under the terms of each agreement, we grant the other party a limited, non-transferable, exclusive, sub-licensable right to access and operate the Nanox System in the region indicated for such party. **We undertake to provide the specified number of Nanox Systems to each entity as indicated in the table below based on agreed shipment schedules, subject to local regulatory approval and material compliance with acceptance test protocol (the "conditions precedent").** The other party undertakes to deploy the systems to provide a minimum number of scans per year (based on 7 scans per day and 23 days per month) on a pay-per-scan basis at a minimum of $14 per scan, and to pay a minimum annual fee (including payments to our partners) in the amount indicated in the table below. The payments are expected to be guaranteed by a standby letter of credit in the amount equal to the minimum annual fee in favor of us after receipt of the conditions precedent.

The Nanox Systems provided under each agreement will remain our property, and the other party will only have a limited license to use the Nanox Systems. In addition, we must approve in writing any sublicense granted under this agreement. We undertake to provide billing, radiology and maintenance services and to provide training for a local medical professional workforce to operate the Nanox.ARC.

Each agreement will be in effect for multiple years, ranging from three to six years from the date of the applicable agreement, and is renewable for an additional multi-year term with both parties' mutual consent as indicated in the table below. Each agreement may be terminated by notice of the non-breaching party in case of a material breach of a party's material obligations, or by either party in case of the bankruptcy or insolvency of the other party.

5

| Entity | Date of MSaaS Agreement | Region | Number of Nanox Systems to be Provided | Minimum Annual Fee and Amount of Letter of Credit (approximate) | Initial Term | Renewal Term |
|---|---|---|---|---|---|---|
| The Gateway Group, Ltd. | February 11, 2020 | Australia, New Zealand and Norway | 1,000 | $58 million | 3 years | 3 years |
| Golden Vine International Company, Ltd. | May 28, 2020 | Taiwan and Singapore | 500 | Up to $29 million | 5 years | 5 years* |
| Promedica Bioelectronics s.r.l. | May 29, 2020 | Italy | 500 | $29 million | 4 years | 3 years |
| JSC Roel Group | May 29, 2020 | Russian Federation | 500 | $12.6 million | 5 years | 5 years |
| Clarity Medical Solution, a division of "Grodnobioproduct" LLC | June 4, 2020 | Belarus | 100 | $3.7 million | 3 years | 4 years |
| Gold Rush | June 16, 2020 | South Africa | 500 | $15.5 million | 3 years | 3 years |
| LATAM Business Development Group Ltd. | July 6, 2020 | Brazil | 1,000 | $4.8 million (9 million Letter of Credit) in Year 1 $14.5 million in Year 2 $24.2 million in Year 3*** | 6 years | 3 years |
| APR 1998 S.L. | July 25, 2020 | Spain | 420 | $11.4 million | 5 years | 5 years** |
| TOTAL | | | 4,520 | $163.8 million | | |

***We have entered into certain business development agreements with finders to obtain MSaaS agreements in specified countries***. Once the standby letter of credit has been issued in connection with each MSaaS agreement above, we will grant warrants to purchase our ordinary shares to the finder who caused such MSaaS agreement to be signed between the Company and the entity. The warrants will be granted in an amount equal to 30% of the amount of the standby letter of credit divided by 35.36 and have an exercise price equal to the fair market value of our ordinary shares at the time of the grant. The finder will also be entitled to 5% of the gross amount that we receive from scans made by the Nanox Systems under the MSaaS agreement. If a finder causes an MSaaS agreement to be signed between us and an entity with a minimum of 23 scans per day at a minimum of $30 per scan, once the standby letter of credit has been issued, we will grant the finder warrants to purchase our ordinary shares in an amount equal to 5% of the amount of the standby letter of credit divided by the fair market value of the ordinary shares at the time of issuance of the warrant. If a finder causes a letter of intent to be signed with an entity that will cooperate to deploy Nanox Systems, we will grant the finder

6

warrants to purchase our ordinary shares in an amount equal to $300,000 divided by the market price of our ordinary shares at the time of the closing of this offering.

***We believe our MSaaS business model has the potential to expand the total size of the X-ray-based medical imaging market.*** We plan to measure the success of our MSaaS business model by annual capacity for Above-the-Line ("ATL") scans which represent the increased capacity of imaging care we can provide to people that originally had no meaningful access to medical imaging. As we expand our operations and deploy more units of the Nanox Systems in an increasing number of countries using the MSaaS model, we expect our ATL scans metric to increase accordingly.

(Emphasis added).

20. The Registration Statement touted the Company's approach to medical imaging by developing a novel x-ray source and that Nano-X's Nanox System would improve upon existing medical imaging solutions, stating in relevant part:

As a first step to producing a new class of affordable medical imaging systems, ***we have focused on identifying and developing a novel X-ray source. Our X-ray source is based on a novel digital microelectromechanical system ("MEMs") semiconductor cathode that we believe can achieve the same functionalities as legacy X-ray analog cathodes, while allowing for lower-cost production than existing medical imaging systems.*** We developed this technology over eight years to reach commercial applicability. ***This novel digital X-ray source is the basis of core technology in the Nanox.ARC, the imaging system we are developing, and we believe it also has the potential to replace the legacy X-ray source in other existing imaging systems.***

\* \* \*

We believe the Nanox System addresses the limitations of existing medical imaging systems on three levels:

- **Digital X-ray source with the potential to significantly reduce the costs of medical imaging systems.** ***We believe our digital X-ray source technology will allow us to manufacture the Nanox.ARC, if cleared, at substantially lower costs compared to medical imaging systems that use a legacy analog X-ray source without sacrificing imaging quality***. A lower cost device has the potential to substantially increase medical imaging availability and improve accessibility of early-detection services broadly across the globe.

- **Technology designed to improve upon the industry standard with integrated radiology diagnostics via a cloud-based MSaaS platform.** ***The Nanox.ARC employs our novel digital X-ray source that is designed to be energy-efficient, smaller and can be more precisely controlled compared to***

7

*existing X-ray source.* By integrating the Nanox.CLOUD, we believe the Nanox System could provide a streamlined process where each scanned image is uploaded automatically to the cloud system and matched to a human radiology expert and decision assistive AI algorithms to provide scan reviews and diagnostics in a significantly shorter time frame than current diagnostics, which could substantially reduce wait-times for imaging results and increase early detection rates compared to currently employed imaging process protocols.

- **Business model designed to increase the availability of medical imaging.** Our primary business model is based on a pay-per-scan pricing structure as opposed to the capital expenditure-based business model currently used by medical imaging manufacturing companies. We believe our business model will significantly reduce the price per scan compared to the current global average cost of $300 per scan, and has the potential to commoditize medical imaging services at prices that are affordable to a greater number of people. *We believe our MSaaS business model has the potential to expand the total size of the X-ray-based medical imaging market.*

*    *    *

*Our Novel Digital X-ray Source*

Realizing that the X-ray tube technology has essentially not changed in more than 100 years and remains a significant source of complexity and cost-driver of existing X-ray-based medical imaging systems, *we developed a novel digital X-ray source that we believe addresses these drawbacks and will enable a new class of medical imaging systems that can be produced at a significantly lower cost than the existing systems.*

*Our technology has its roots in field emission display ("FED") technology. FED technology was originally developed by Sony with other technology partners, for television screens and monitors, offering a novel way of lighting screen pixels compared to traditional cathode-ray tubes that were based on a one-source electron gun beam.* The field emission display innovation used multiple nano-scale electron guns to achieve a much higher quality image with significantly reduced motion blur effects. In 2009, after having invested substantial resources in the development of this technology for over a decade including through a joint venture called Field Emission Technologies, Inc. ("FET"), Sony ceased development of the project.

(Emphasis added).

21. The statements referenced in ¶¶19-20 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Nano-X's commercial agreements and its customers were fabricated; (2) Nano-X's statements regarding its "novel" Nanox System were misleading as the Company never provided data comparing its images with images from competitors' machines; (3) Nano-X's submission to the U.S. Food and Drug Administration ("FDA") admitted the Nanox System was not original; and (4) as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

**The Truth Emerges**

22. On September 15, 2020, Citron Research ("Citron") published the report entitled, "Nano-X Imaging (NNOX) A Complete Farce on the Market – Theranos 2.0" (the "Citron Report"). The Citron Report summarized Nano-X as "this $3 billion company is nothing more than a science project with a simple rendering, minimal R&D, fake customers, no FDA approval, and fraudulent claims that are beyond the realm of possibility."

23. The Citron Report revealed that the Company's claims about its customers with commercial agreements were false, stating in relevant part:

**But What About The Customers Who Have Submitted Orders?**

***Despite not having any unique technology, FDA approval, or even a working model,*** NNOX appears to have put out distribution agreements. As we all know, these agreements are worthless unless NNOX can deliver on its ridiculous claims. ***NNOX's commercial agreements may sound nice on the surface, but these appear to be no more than fake customers***.

\*　　\*　　\*

9

Below are several examples of how ludicrous NNOX's claims are that these are real customers.

***The Gateway Group is listed as NNOX's largest customer, yet nowhere on the company's website do they mention operating in the medical device sector***. The Gateway Group notes being a wholesaler/distributor in the below sectors:
• FMCG
• Drinks
• Beauty and cosmetics
• Health food, supplement and sports nutrition
• Luxury hair care
• Consumer electronics, audio products and commercial electronics

https://www.thegatewaygroup.com.au/ourcompanies

Below is a photo of the office of Golden Vine international Company.



https://www.findcompany.com.tw/en/Golden%20Vine%20International%20Co.,%20Ltd

***Another major customer, LATAM Business Development Group, claims to be located in Brazil, yet only has three employees who are all located in Israel where NNOX is also coincidentally located.***

10



https://www.linkedin.com/company/latam-business-development-group/
https://www.latam-bd.com/team

(Emphasis added).

24.    The Citron Report also discussed how the Company has not published any data comparing images from its machines with other x-ray machines and that Nano-X's statements that it was creating a novel solution to medical imaging was false, stating in part:

**NNOX – The Truth**

***NNOX has never published any data showing their machine's images compared to images from a standard CT scanner. There is not one scientific paper or submission that would back up any of these claims. As a matter of fact, we have not even seen proof of the product and have only seen a mockup drawing of what this machine is supposed to look like.***

To put the scale of this lie into perspective, just look at the medical imaging industry. Medical imaging is a highly competitive market with definitive leaders pushing the envelope namely: GE, Siemens, Philips, and Fuji. The only way to create a better mousetrap would be through years of R&D.

What you are about to read is accurate, and no we did not miss a 0. Since its founding in 2018, **NNOX claims that it has disrupted the medical imaging market with a total R&D spend of $7.5 million**.

*      *      *

Compare this to GE Healthcare, a leading player in the medical imaging sector, who invested over $1 billion in R&D just last year.

(Emphasis added).

25.    The Citron Report noted and explained that the Company's 510(k) application to the FDA for the Nanox System was an admission that the Company did not have a novel product, stating in part:

11

*By submitting a 510(K), you are saying you have nothing new and are seeking easy approval as you are just another product that has already been tested.*

(Emphasis added).

26. On this news, Nano-X's stock price fell $12.41 per share, or more than 25%, over the next two trading days to close at $36.80 per share on September 16, 2020, damaging investors.

27. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

28. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the publicly traded securities of Nano-X during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

29. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

30.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

31.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

32.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants' acts as alleged violated the federal securities laws;

(b)     whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c)     whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e)     whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f)     whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g)      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

33.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

34.      Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)      Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)      the omissions and misrepresentations were material;

(c)      the Company's securities are traded in efficient markets;

(d)      the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)      the Company traded on the NASDAQ, and was covered by multiple analysts;

(f)      the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(g)      Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

35. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

36. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**<ins>COUNT I</ins>**
**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
**Against All Defendants**

37. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

38. This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

39. During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

40. The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff

15

and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

41.     The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

42.      Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

43.     As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially

inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

44.     Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

45.      As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

46.     By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II
### Violation of Section 20(a) of The Exchange Act
### Against The Individual Defendants

47.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

48.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

49.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the

17

Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

50. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

51. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

52. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

18

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.


Dated: September 16, 2020            Respectfully submitted,

                                     **THE ROSEN LAW FIRM, P.A.**

                                     By: /s/ Phillip Kim
                                     Phillip Kim, Esq. (PK 9384)
                                     Laurence M. Rosen, Esq. (LR 5733)
                                     275 Madison Ave., 40th Floor
                                     New York, NY 10016
                                     Tel: (212) 686-1060
                                     Fax: (212) 202-3827
                                     Email: pkim@rosenlegal.com
                                     Email: lrosen@rosenlegal.com


                                     *Counsel for Plaintiff*