# Exhibit 2

Case 1:20-cv-04355-WFK-MMH    Document 86-2    Filed 02/03/23    Page 1 of 58 PageID #: 1230

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE NANO-X SECURITIES LITIGATION | No. 21-cv- 05517-RPK-PK<br><br>AMENDED COMPLAINT<br><br>JURY TRIAL DEMANDED |

Case 1:21-cv-05517-RPK-PK Document 24 Filed 02/03/23 Page 1 of 55 PageID #: 1231

**TABLE OF CONTENTS**

I.    NATURE OF THE ACTION ................................................................................1

II.   JURISDICTION AND VENUE .........................................................................3

III.  PARTIES ............................................................................................................4

IV.  SUBSTANTIVE ALLEGATIONS ....................................................................5

     A.    Background on the Company.......................................................................5

     B.    Background on the Legacy Analog X-Ray Source, Limitations of the Existing Medical Imaging System and Nano-X Imaging's Purported Novel Digital X-Ray Source .........................................................................................6

          1.    Legacy Analog X-ray Source and Limitations of Existing Medical Imaging Systems.......................................................................6

          2.    Nano-X's Purported Novel X-ray Source ......................................7

     C.    The FDA Applications..................................................................................9

     D.    Background on the Initial Public Offering and the Secondary Public Offering ....10

          1.    The SEC Staff's Questioning of the Basis for Nano-X's Claim Regarding the Lower Cost of the Nanox.ARC Shows that the SEC Considered the Company's Statements About Costs Material ...........................................10

               a.    The December 4, 2019 Draft Registration Statement....................10

               b.    The SEC Files a Letter Raising Questions About the Company's Cost Estimates Concerning the Nanox.ARC ................................10

          2.    The Initial Public Offering Showcased the Company's Only Product ......12

          3.    In Its Second Public Offering the Company Once Again Touted Its Only Product ................................................................................................13

     E.    Allegations Explaining Why Nano-X's Estimate Cost For Purchasing and Assembling the Components of the Nanox.Arc is Not Supported by the Materials Provided by Nano-X in Investor Presentations, Other SEC Filings and Filed Patents..............................................................................................................13

          1.    The Purported Capabilities of the Nanox.ARC and the Capabilities of the CT Scanner are Not the Same, Which Makes a Cost Comparison of the Two Systems Misleading..........................................................................13

2. Nano-X Has Misrepresented the Cost of Purchasing and Assembling the Components for Manufacture of the Nanox.ARC .................................17

3. A Review of the 15 Patent Applications Filed by Nano-X Reveals that None of them Concern Novel Technology that Would Explain the Alleged Lower Cost of Assembling the Nanox.ARC...............................................19

F. Defendants Had a Duty to Disclose that the Cost for Assembling the Nanox.ARC is Not $10,000 and that its Nanox.ARC is Not Comparable to the Existing CT Scanner...................................................................................................20

V. THE MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD.........................................................................................22

VI. THE TRUTH BEGINS TO EMERGE ...............................................................33

VII. ADDITIONAL ALLEGATIONS DEMONSTRATING SCIENTER ...............................34

A. Defendants Had No Basis to Make the Repeated Statements They Did Regarding the Estimate of the Aggregate Cost of Purchasing and Assembling the Components of the Nanox.ARC ..........................................................................35

B. The Company's Correspondence with the SEC Concerning the SEC Staff's Questioning of the Basis for Nano-X's Claim Regarding the Low Cost of the Nanox.ARC Supports an Inference of Scienter ......................................................37

C. Defendants' Repeated Statements Concerning the Estimate of the Aggregate Cost of Purchasing and Assembling the Components of the Nanox.ARC Support an Inference of Scienter ................................................................................38

D. The "Core Operations" Theory Supports an Inference of Scienter .......................39

E. Defendants' Failure to Disclose Information That They Had a Clear Duty to Disclose Supports an Inference of Scienter ..........................................................40

F. The Fact That the Company Continues to Push Back Shipment of the First 1,000 Units of the Nanox.ARC Supports an Inference of Scienter ...............................40

G. The Fact that The Company Ceased Making the Repeated Statements Concerning the Estimate Cost of Purchasing and Assembling the Components of the Nanox.ARC, After Announcing Receipt of the SEC Subpoena, Supports an Inference of Scienter ................................................................................43

VIII. CONTROL PERSON ALLEGATIONS.................................................................44

IX. LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS ............................................45

X. NO STATUTORY SAFE HARBOR......................................................................47

ii

XI.     PRESUMPTION OF RELIANCE ............................................................................48

COUNT I .........................................................................................................................49

COUNT II ........................................................................................................................49

PRAYER FOR RELIEF ..................................................................................................50

DEMAND FOR TRIAL JURY ........................................................................................51

Lead Plaintiff Davian Holdings Limited ("Davian Holdings") individually and on behalf of all others similarly situated, alleges the following based upon information and belief as to the investigation conducted by Lead Plaintiff's counsel, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Nano-X Imaging ("Nano-X" or the "Company"), securities analyst research reports, press releases, investor presentations, Nano-X's website and other public statements issued by, or about, the Company. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.  NATURE OF THE ACTION

1.  This is a federal securities class action on behalf of purchasers of Nano-X Imaging securities between August 21, 2020 and November 17, 2021 inclusive, seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.  Nano-X purports to be a company that designs and produces X-ray source technology for the medical imaging industry. Defendants described Nano-X's development of a new X-ray source as "novel" and represented that the Company was "focused on applying [its] proprietary medical imaging technology to make diagnostic medicine more accessible and affordable across the globe."

3.  Since its first initial public offering ("IPO"), the Company has persisted in its claim that it can manufacture an X-Ray system (the Nanox.ARC) that is comparable to the computerized tomography ("CT") scanner *and at a significantly lower cost,* thereby revolutionizing the medical imagining market.

4.  Throughout the Class Period, Defendants touted to investors the capabilities and cost of its Nanox.ARC product, including:

1

> Our X-ray source is based on a novel digital microelectromechanical system ("MEMs") semiconductor cathode that **we believe can achieve the same functionalities as legacy X-ray analog cathodes, while allowing for lower-cost production than existing medical imaging systems.**
>
> ***
>
> We currently estimate the aggregate cost of purchasing and assembling the components of the Nanox.ARC **will be approximately $8,000 to $12,000 per unit**, assuming at least 15,000 Nanox.ARC units will be manufactured. We believe this will enable us to offer the Nanox System at a **substantially lower cost than the cost of existing medical imaging systems based on analog X-ray sources.**

(Emphasis supplied).

5. The foregoing statements were materially false and/or misleading because Nano-X failed to disclose that: (i) the actual costs for assembling the Nanox.ARC was likely to be at least $40,000 to $50,000 pe unit, e.g., upwards of 4-5 times greater than represented; and (ii) the Nanox.ARC was not comparable to the existing CT imaging, since it was unable to provide the same level of high resolution, the gold standard for medical imaging devices. As a result, the prospective marketability and profitability of the Nanox.ARC, if any, was far more uncertain than investors were led to believe.

6. The truth of this matter did not begin to emerge until November 17, 2021, when investors learned that the Securities and Exchange Commission ("SEC") has subpoenaed Company documents, **"relating to the development cost of the Company's Nanox.ARC prototypes, as well as the Company's estimate for the cost of assembling the final Nanox.ARC product at scale."** (Emphasis supplied).

7. On this news, the Company's stock price declined $1.73, or 7.96%, from $21.74 on November 16, 2021, to $20.01 on November 17, 2021.

8. On November 18, 2021, *Oppenheimer* Equity Research issued a report entitled, "Nano-X Imaging Ltd. FDA Strategy Murky; SEC Subpoena Received," questioning, "**[w]hy did**

**SEC request reach subpoena stage? Remember, company commentary on $100 tube and $10,000 system cost at mass production . . . Sanctity of company commentary questionable given shifting explanations on deliverables. [] New SEC subpoena is concerning** . . ." (Emphasis supplied).

9. On this news, the Company's stock price declined another $1 or 5%, from $21.01 on November 17, 2021, to $19.01 on November 18, 2021. On April 12, 2022, Nano-X stock closed at $10.99. The Company has yet to receive FDA approval for its "novel" Nanox.ARC, despite having filed an application for approval with the Food and Drug Administration ("FDA") in June 2021 and claiming to be in communication with the FDA regarding the application. Furthermore, to date, the Company has not sold a single Nanox.ARC.

10. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiff and other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

11. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

13. Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as the alleged misstatements entered and subsequent damages took place within this judicial district.

14. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

3

including but not limited to, the U.S. mail, interstate telephone communications and the facilities of the national securities exchange.

### III.     <u>PARTIES</u>

15.     Pursuant to this Court's Order of January 25, 2022 (ECF No. 22) Davian Holdings was appointed Lead Plaintiff. The Davian Holdings certification has been previously filed with the Court and is incorporated herein.

16.     Defendant Nano-X purportedly develops and produces X-ray source technology for the medical imaging industry. The Company is organized under the laws of Israel with its principal executive offices located at Communications Center Neve Ilan, Israel 9085000. The Company's securities trade on NASDAQ under the ticker symbol "NNOX."

17.     Defendant Ran Poliakine ("Poliakine") served as Nano-X's Chief Executive Officer ("CEO") and a Director of the Company from the Company's formation until January 2022. On August 10, 2021, the Company released its 2Q 2021 financial results and announced that Defendant Poliakine would resign as CEO, effective January 2022. On August 19, 2021, the Company disclosed that on August 12, 2021 it had received a request for additional information from the FDA concerning the Company's application for approval of the Nanox.ARC and that the submission file was placed on hold "pending a complete response to the FDA's list of deficiencies." Defendant Poliakine signed the IPO Registration Statement (defined below) the SPO Registration Statement (defined below) and the 2020 20-F (defined below), which contained various of the alleged material misstatements and also made various alleged material misstatements in investor presentations and calls.

18.     Defendant Itzhak Maayan ("Maayan") served as Nano-X's Chief Financial Officer ("CFO") from November 2019 until September 2021. On August 10, 2021, the Company released its 2Q 2021 financial results and announced that Defendant Maayan would resign as CFO,

4

effective September 2021. On August 19, 2021, the Company disclosed that on August 12, 2021, it had received a request for additional information from the FDA concerning the Company's application for approval of the Nanox.ARC and that the submission file was placed on hold "pending a complete response to the FDA's list of deficiencies." Defendant Maayan signed the IPO Registration Statement (defined below) and the SPO Registration Statement (defined below), which contained various of the alleged material misstatements

19. Poliakine and Maayan are sometimes collectively referred to herein as the "Individual Defendants."[1]

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Background on the Company

20. The Company was incorporated in Israel as "NANO-X IMAGING LTD" on December 20, 2018 and commenced operations on September 3, 2019. Substantially all of the Company's assets have been acquired from a predecessor company, Nanox Imaging PLC ("Nanox Gibraltar").

21. Nano-X is a development-stage company that designs, produces, and seeks to commercialize digital X-ray source technology for the medical imaging industry worldwide. The Company is purportedly developing a new, affordable, medical imaging system, which Nano-X refers to as its "Nanox System". The Nanox System has two integrated components—a hardware component called the "Nanox.ARC," and a software component called the "Nanox.CLOUD". The Nanox.ARC purportedly uses a *novel* X-ray source, also developed by the Company. The Nanox.ARC is the sole product currently in development by the Company.

---

[1] In this Amended Complaint, filed April 12, 2022, Lead Plaintiff has abandoned its previous claims against Tal Shank, a defendant in the original complaint, filed on October 5, 2021. ECF No. 1.

B.    **Background on the Legacy Analog X-Ray Source, Limitations of the Existing Medical Imaging System and Nano-X Imaging's Purported Novel Digital X-Ray Source**

1.    **Legacy Analog X-ray Source and Limitations of Existing Medical Imaging Systems**

22.    Current state-of-the-art technology in medical imaging includes several X-ray techniques including simple planar X-rays (as used for looking at fractured bones, for example) to sophisticated X-ray devices referred to as CT scanners which produce 3-dimensional ("3D") information from hundreds to thousands of individual images.  X-ray instruments are used frequently because scanning is fast (minutes) and provides decent results for a lot of applications, especially for imaging of bone structures and lungs.

23.    X-rays can be generated by accelerating a stream of electrons to high speeds to hit a metal target.  The source of the electrons was originally a piece of metal at room temperature, subsequently it was found that if this part was heated (like the filament in a lightbulb) it would "encourage" electrons to leave the metal, and this method quickly replaced the original. This second method is called thermionic (heat-based) or "hot cathode" while the original is often called "cold cathode." In the hot cathode method, the metal filament (or cathode) is heated up to approximately 2,000°C to generate the electron stream which is accelerated through an empty region and onto another metal target (the "anode"). The original scheme is called "cold cathode" and can be somewhat improved by making the cathode into a pointed needle shape instead of flat, but these needles tend to degrade, and this method is therefore still far less popular than the hot cathode.  In both cases, the collision of electrons onto the anode produces 1% X-rays and 99% heat at the point of impact on the anode.  The amount of energy required to either heat the filament (for hot cathode) or to cause field emission of electrons (for cold cathode) is generally a tiny fraction of the energy required to accelerate the electrons from cathode to anode and therefore the

6

total energy budget of the two methods is nearly identical. Like lightbulbs, X-ray sources come in different sizes, with higher-power units for situations requiring greater illumination.

24.    The main categories of medical imaging systems that use X-ray sources include CT (3D cross-sectional 360° "slicing" X-ray imaging), mammography (2D and 3D breast X-ray imaging), fluoroscopy (real-time X-ray video imaging), angiogram (blood vessels, contrast X-ray imaging) and dental (2D and panoramic X-ray imaging).

25.    General radiographic X-ray tubes are not well suited for use in a CT scanner, which requires a powerful X-ray source to provide enough X-ray "light" for the hundreds to thousands of images being taken during a CT scan. These tubes are designed to withstand the excessive amount of heat produced by continuous operation, with a method for cooling the analog X-ray source, e.g. by means of routing a cooling fluid through the anode just as cooling oil is routed through a car's combustion engine. As a result of these complexities, most high-quality X-ray tubes for a CT scanner will weigh 50-100 Kilograms and generally cost over $150,000. The power of a CT scan tube is around 100 Kilowatts as compared to a chest or dental X-ray tube with a power of 100 Watts—1,000 times less power. The cost of an assembled CT scanner may reach a few million dollars.

### 2.    Nano-X's Purported Novel X-ray Source

26.    In the IPO Registration Statement Nano-X states, "[r]ealizing that the X-ray tube technology has essentially not changed in more than 100 years and remains a significant source of complexity and cost-driver of existing X-ray-based medical imaging systems, we developed a novel digital X-ray source that we believe addresses these drawbacks and will enable a new class of medical imaging systems that can be produced at a significantly lower cost than the existing systems."

7

27.     Nano-X claims that their technology has its roots in field emission display ("FED") technology.  FED technology was originally developed by Sony with other technology partners, for television screens and monitors, offering a novel way of lighting screen pixels compared to traditional cathode-ray tubes that were based on a one-source electron gun beam. The field emission display innovation used multiple nano-scale electron guns to achieve a much higher quality image with significantly reduced motion blur effects. In 2009, after having invested substantial resources in the development of this technology for over a decade including through a joint venture called Field Emission Technologies, Inc. ("FET"), Sony ceased development of the project.

28.     In 2009, FET dissolved and transferred certain assets to FET Japan Inc. ("FETJ"). Scientists in Nano-X's team, who worked at FETJ, applied their expertise to develop non-display related applications, including their X-ray source technology. In 2011, Nano-X's predecessor company acquired certain non-display related know-how from FETJ and certain members of the FETJ technical team joined Nano-X.  After acquiring the technology, Nano-X purportedly developed a digital X-ray source for the medical imaging industry that could be produced on a commercial scale. Their X-ray source is purported to be a microelectromechanical system ("MEM") based semiconductor cathode that achieves electron emission by a non-thermionic low-voltage trigger to approximately 100 million nano-scale molybdenum cones that act as multiple electron "guns," instead of a single heated filament (the cold cathode).  Nano-X calls the tube using this source the "Nano-X tube" and Nano-X has stated that it can be mass produced at approximately $100 per tube/unit.   The product, the Nanox.ARC, uses a set of such tubes disposed along the circumference of an arc or ring through which the patient passes.   The Company

represents that its Nano-X tube would replace the legacy X-ray tube, which costs approximately $150,000.

29.     Nano-X states that a technological advantage of its X-ray source is that it "could reduce the complexity and cost of the Nanox.ARC compared to legacy CT devices" and that it "believes that by using our X-ray source we will be able to significantly reduce the size of X-ray tubes and simplify the structure of our medical imaging system."

### C.     The FDA Applications

30.     The Nanox.ARC has two versions—a single-source and a multi-source. The single-source Nanox.ARC is referred to by the Company as the Nanox.CART.

31.     The Company submitted an FDA application for approval of the Nanox.CART in January 2020. The FDA approved the Nanox.CART in April 2021. The Nanox.CART was approved by the FDA *only* for X-rays of hands, fingers and wrists and specifically *not* for general radiologic examinations.

32.     The Company submitted an FDA application for the multi-source Nanox.ARC in June 2021. On August 19, 2021, the Company disclosed that on August 12, 2021 it had received a request for additional information from the FDA concerning the Company's application for approval of the Nanox.ARC and that the submission file was placed on hold "pending a complete response to the FDA's list of deficiencies." The Company purports to be in communication with the FDA regarding the application for approval of the Nanox.ARC. To date, the application is pending.

9

**D.** **Background on the Initial Public Offering and the Secondary Public Offering**

    **1.** **The SEC Staff's Questioning of the Basis for Nano-X's Claim Regarding the Lower Cost of the Nanox.ARC Shows that the SEC Considered the Company's Statements About Costs Material**

    **a.** **The December 4, 2019 Draft Registration Statement**

33. In connection with its IPO, on December 4, 2019, Nano-X filed its first Draft Registration Statement on Form F-1 and stated, **"we plan to market and deploy the Nanox System broadly across the globe at a substantially lower cost compared to currently available medical imaging systems**, such as computed tomography ("CT"). We believe that, if cleared, **our technology's relatively low cost has the potential to enable us to increase the accessibility and affordability** of early-detection medical imaging systems globally." (Emphasis supplied). In the December 4, 2019 Draft Registration Statement, the Company did not include specific figures regarding how much it estimated it would cost to manufacture and/or assemble the Nanox.ARC.

    **b.** **The SEC Files a Letter Raising Questions About the Company's Cost Estimates Concerning the Nanox.ARC**

34. On December 31, 2019, the SEC's Division of Corporation Finance, Office of Life Sciences, filed a letter addressed to Defendant Poliakine. The December 31, 2019 letter shows that the SEC considered the Company's statements regarding cost comparisons between its Nanox.ARC product and currently existing medical imaging systems material. In the letter, the SEC said that it had reviewed the December 4, 2019 Draft Registration Statement and added, "[p]lease **revise paragraph four to briefly discuss the basis for the statement** that you will be able to **market and deploy** the Nanox System broadly across the globe '**at a substantially lower cost** compared to currently available medical imaging systems, such as computed tomography.'" (Emphasis supplied).

35.     On January 14, 2020, the Company replied to the SEC's comments regarding paragraph four as follows: "In response to the Staff's comment, **the Company has expanded its disclosure on pages 1, 72 and 78 of the Revised Registration Statement to explain the basis for the statement that the Company will be able to market and deploy the Nanox System broadly across the globe at substantially lower cost** compared to currently available medical imaging systems, such as computed tomography." (Emphasis supplied). The letter was signed by the Company's attorney.

36.     On February 18, 2020, the Company filed another Draft Registration Statement, providing more specificity about the basis for its cost estimate, including providing specific cost figures. The Company made the following materially false and/or misleading statements, which were also repeated in the IPO and SPO (defiled below) Registration Statements:

> P. 1: If cleared, **we plan to market and deploy the Nanox System globally at a substantially lower cost** than currently available medical imaging systems, such as computed tomography ("CT"), **because our digital X-ray source will allow the Nanox.Arc to have a more simplified structure without the costly cooling equipment or the complex rotating mechanism used in legacy CT devices**.

> P. 72: As a first step to producing a new class of affordable medical imaging systems, we have focused on identifying and developing a novel X-ray source. Our X-ray source is based on a novel digital MEMs semiconductor cathode that we **believe can achieve the same functionalities as legacy X-ray analog cathodes, while allowing for lower-cost production than existing medical imaging systems**.

> P. 78: We also **expect to be able to offer the Nanox System for a substantially lower cost than existing medical imaging systems** . . .We believe our novel X-ray source is crucial to our ability to substantially reduce the manufacturing cost of the Nanox.Arc. rotating mechanisms used in legacy CT devices. **We currently estimate the aggregate cost of purchasing and assembling the components of the Nanox.Arc will be approximately $8,000 to $12,000 per unit** . . .

(Emphasis supplied).

11

**2.      The Initial Public Offering Showcased the Company's Only Product**

37.      On July 30, 2020, Nano-X filed a Registration Statement on Form F-1 with the SEC. On August 14, 2020, the Company filed Amendment No. 1 to Form F-1 Registration Statement. On August 20, 2020, the Company filed Amendment No. 2 to Form F-1 Registration Statement. (together, the July 30, August 14 and August 20, 2020 Registration Statements, are referred to, as the "IPO Registration Statement"). The IPO Registration Statement was declared effective on August 20, 2020.

38.      The Individual Defendants signed the IPO Registration Statement.

39.      The IPO Registration Statement stated, in relevant part:

> Early detection saves lives—and we at Nanox are focused on applying our proprietary medical imaging technology to make diagnostic medicine more accessible and affordable across the globe. Our vision is to increase early detection of medical conditions that are discoverable by X-ray, which we believe is key to increasing early treatment, improving health outcomes and, ultimately, saving lives.
>
> To further our vision, we have developed a prototype of the Nanox.ARC, a medical imaging system incorporating our novel X-ray source, and we have developed a prototype of the Nanox.CLOUD, a companion cloud software. If cleared, we plan to market and deploy the Nanox System broadly across the globe at a substantially lower cost compared to currently available medical imaging systems, such as CT. We believe that, if cleared, our technology's relatively low cost will enable us to increase accessibility and affordability of early-detection medical imaging systems globally.
>
> Since our inception, we have devoted substantially all of our financial resources to acquiring the base technology for our X-ray source and related know-how, conducting research and development activities, organizing and staffing our company, developing our business plan, securing related intellectual property rights and raising capital.

40.      Nano-X securities began trading on NASDAQ on August 21, 2020.

41.      On August 24, 2020, Nano-X filed its final prospectus with the SEC on Form 424B4, which incorporated and formed part of the final IPO Registration Statement.

12

42.     The IPO closed on August 25, 2020.  In the IPO, the Company sold "10,555,556 ordinary shares" at "$18 per share for gross proceeds of approximately $190 million."

### 3.     In Its Second Public Offering the Company Once Again Touted Its Only Product

43.     In connection with its SPO, on February 8, 2021 Nano-X filed a Registration Statement on Form F-1 with the SEC.  On February 10, 2021 the Company filed Amendment No. 1 to Form F-1 Registration Statement.  (together, the February 8 and 10, 2020 Registration Statements, are referred to, as the "SPO Registration Statement.")   The SPO Registration Statement was declared effective on February 10, 2021.

44.     The Individual Defendants signed the SPO Registration Statement.

45.     The SPO Registration statement contained the same statements as those in ¶ 39.

46.     On a press release dated February 10, 2021, Nano-X announced that it had priced the previously announced underwritten public offering of 3,091,635 of its ordinary shares at a public offering price of $62.50 per share and that the offering was expected to close on or about February 16, 2021.

47.     On February 12, 2021, Nano-X filed its final prospectus with the SEC on Form 424B4, which incorporated and formed part of the final SPO Registration Statement.

### E.     Allegations Explaining Why Nano-X's Estimate Cost For Purchasing and Assembling the Components of the Nanox.Arc is Not Supported by the Materials Provided by Nano-X in Investor Presentations, Other SEC Filings and Filed Patents

#### 1.     The Purported Capabilities of the Nanox.ARC and the Capabilities of the CT Scanner are Not the Same, Which Makes a Cost Comparison of the Two Systems Misleading

48.     During the Class Period, Nano-X claimed that they "plan to market and deploy the Nanox System broadly across the globe at a **substantially lower cost compared to** currently

13

available medical imaging systems, such as **computed tomography (“CT”).”** Nano-X has also claimed that its “technology’s relatively low cost has the potential to enable us to increase the accessibility and affordability of early-detection medical imaging systems globally.” The Company has also represented that it “expect[s] to be able to offer the Nanox System for a **substantially lower cost than existing medical imaging systems** . . .” (Emphasis supplied).

49. The import of these statements is that the Nanox.ARC can replace the CT and do so at a much lower cost to assemble and ultimately at a lower cost and accessibility to patients worldwide. However, the purported capabilities of the Nanox.ARC are not the same as the capabilities of the CT scanner. The CT scanner has significantly greater image resolution and clarity capabilities than those of the Nanox.ARC. While a CT scanner makes a 3D image doing tomography (a technique for displaying a representation of a cross section through a human body or other solid) reconstructed from hundreds to thousands of images, the Nanox.Cart (the only FDA-cleared device that Nano-X has) cannot take more than a single image. The Company’s Nanox.Arc device has performed only nominally better. Neither the Nanox.CART nor the Nanox.ARC can perform tomography.

50. The high-resolution and 3D reconstruction available in CT scanner images results from the use of tomography and is achieved by rotation of the X-ray source and “camera” or “detector” around the patient’s body, taking hundreds to thousands of images in a number of seconds, which are then used to reconstruct the scanned object or person, using “slices” or other 3D visualizations. On the other hand, the Nanox.ARC purports to use a small number of angles which would result in information-poor images, either having low resolution and/or limited depth of field; known as tomosynthesis. The advantage of a CT scanner is that it builds a full 3D representation, which tomosynthesis cannot do. Tomosynthesis has never been in wide use since

there is no advantage to tomosynthesis over a set of simple X-rays taken from several views. The fewer projections, the worse the resolution, as shown below:



2 Angles    4 Angles    8 Angles    16 Angles

32 Angles    64 Angles    96 Angles    128 Angles

*Image reconstruction as function of number of angles used,*
http://xrayphysics.com/ctsim.html

51. In the figure below (Fig. 1), accessible here: https://web.archive.org/web/20190622042738/https:/www.nanox.vision/, as well as in various investor presentations, Nano-X compares the legacy CT tube (left) with its Nano-X tube (right). As described above, the legacy tube (left) used in CT scanners heats up a metal filament to 2,000°C to produce the electron streams necessary for X-ray emission. The legacy tube requires high-voltage, complex mechanics and special cooling to produce the electrons needed for X-ray emission which results in the "$150,000 average cost." Also as described above, the Nano-X tube purports to employ a novel X-ray source with negligible heat generation, which, the Company purports to be able to mass produce at "~$100 cost." However, the cost comparison is inapposite

15

because the capabilities of the legacy tube and the Nano-X tube are widely different. While the legacy tube runs to about 100 Kilowatts, or 100,000 Watts, the Nano-X tube, by the Company's own admission, runs to about 100 Watts. Therefore, the Nano-X tube produces 1,000 times less X-ray intensity (making a CT-quality scan impossible, even if the Nano-X tubes were to be used in a CT scanner, with a detector and rotating gantry).



**Fig. 1**

52. The Company admits that the Nanox.ARC runs at approximately 100 Watts max. For example, the figure below (Fig. 2) accessible here: https://web.archive.org/web/20190622042738/https:/www.nanox.vision/, shows that the Company represents the power of the Nanox.ARC to be 40KV multiplied by 2.5mA, which is 100 Watts. A similar claim is made by the Company in its FDA application for the Nanox.CART.



16

**Fig. 2**

53. In the figure below (Fig. 3), accessible here: https://web.archive.org/web/20190622042738/https:/www.nanox.vision/, the Company compares the cost of the two systems, stating that the current CT scanner "costs millions of dollars" whereas the Nanox.ARC "costs thousands of dollars" disregarding the fact that, as previously discussed, the two systems have entirely different capabilities.

# Enabling a system level advancement

## From



Analog
Large and complex
Costs millions of dollars
Limited spectrality (2 energy levels)

## To



Digital
Fits into a suitcase
Costs thousands of dollars
Multi-spectral (unlimited energy levels)
Better image quality

**Fig. 3**

### 2. Nano-X Has Misrepresented the Cost of Purchasing and Assembling the Components for Manufacture of the Nanox.ARC

54. During the Class Period, Defendants made various statements concerning their estimate cost of the Nanox.ARC. For example, they stated, "[w]e currently estimate the aggregate cost of purchasing and assembling the components of the Nanox.Arc will be approximately $8,000 to $12,000 per unit," and "[w]e can eliminate huge amount of the cost and create accessibility and

17

very low cost device all the way to $10,000 in mass production . . .” As previously disused, the exact cost figure was only disclosed after the SEC asked the Company to disclose more specifics on its cost claims.

55. The Company largely attributed the lower cost of the Nanox.ARC to the fact that it purports to be able to be able to manufacture the Nano-X tube for $100 versus the $150,000 cost for the legacy tube in CT scanners. For example, as Defendant Poliakine stated, “[t]he cost associated with the source [] is dramatically less [] because it’s mass-produced semiconductors that we estimate to be less than $100 in mass production versus $150,000 for average cost of a similar X-ray tube, and that's a big difference.”

56. However, this price estimate is impossible when considering the different parts required by an X-ray system—not just the cost associated with the X-ray tube. A “detector” is a vital and expensive component in any X-ray system. The detector serves the function of turning absorbed X-rays into an image. The X-ray tube is like a light source and the detector is like a camera—without light the camera will not “see” anything while without the camera you are unable to take the picture. The old “detector” was a piece of photographic film, while today faster and more sensitive digital detectors are available—at a substantial cost. These detectors are necessary for a CT-quality scan, which again, entails taking hundreds to thousands of images within at most a minute’s time (requiring minimal movement from the patient who is instructed to hold their breath).

57. Nano-X purports to make a digital system which necessitates a digital detector. Nano-X has never claimed that the Nanox.ARC can be manufactured without a detector and while Nano-X has represented that it has developed the novel Nano-X tube, it has not represented that it has developed a new detector. The Company claims to be using a “DRTECH Exprimer” detector

and in its FDA application for the Nanox.CART the Nanox.CARC is portrayed as using the same detector. The cost of an DRTECH Exprimer detector is $20,000. Even the lowest-end digital detectors start at around $15,000, but neither the ExPrimer nor other low-cost detectors are suitable for the higher-quality rapid images that Nano-X claims to produce with its multi-source device. Higher quality detectors cost anywhere between $35,0000 to $70,000. *See* https://info.blockimaging.com/dr-panel-price-cost-guide.

58. While the detector is the costliest item in the purported Nanox.ARC—anywhere from $35,000 to $70,000—the machine would also need additional costly items. While the Nanox.ARC would not include a costly rotating gantry (like a CT scanner), it does need an X-ray bed capable of supporting a very large patient (presumably without bending), a high voltage power supply, a translation stage that moves the arc over the patient (or moves the bed through the arc), power supply and computers—all of which would add at least another $20,000 to the cost of the components. This cost estimate does not even include the added cost of assembly nor a profit margin. Accordingly, Nano-X's claims that its Nanox.ARC will be assembled at a cost of $10,000, or anywhere between $8,000 to $12,000, is unsupportable, even if the Company is able to manufacture its purported Nano-X tube for $100 a unit at mass production.

### 3. A Review of the 15 Patent Applications Filed by Nano-X Reveals that None of them Concern Novel Technology that Would Explain the Alleged Lower Cost of Assembling the Nanox.ARC

59. As previously discussed, the Company attributed the "substantially lower cost" of assembling the Nanox.ARC to its "novel" cold cathode housed in the Nano-X tube.

60. None of the patent applications concern technology that would explain how the Nanox.ARC could be assembled for the lower-cost of $10,000, nor explain a longer-life of the Nano-X tubes. If anything, the patents reveal that lifetime and other aspects of cold cathode tubes

are problematic, per Nano-X's own words: "the [cold cathode] electron sources … have a short lifespan, poor stability and poor uniformity."[2]

61.    Furthermore, a cold cathode, like the Nano-X tube, requires a clean room and special equipment that unavoidably increases the per-unit cost over the equivalent hot cathode tube, which requires only technology similar to that required for making incandescent light bulbs—technology that has been common since the 1950's at least.

62.    Both methods require glass forming under a vacuum, and both require high-voltage power supplies of approximately 100 Kilovolt.  To increase the lifetime of a cold cathode one method is to use ultrahigh vacuum, which increases the cost beyond that of a conventional tube.

**F.    Defendants Had a Duty to Disclose that the Cost for Assembling the Nanox.ARC is Not $10,000 and that its Nanox.ARC is Not Comparable to the Existing CT Scanner**

63.    Pursuant to Item 303 of Regulation S-K, 17 C.F.R. § 229.303(ii), Nano-X and the Individual Defendants had an affirmative, independent duty to disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  By failing to disclose that:  (i) the actual costs for assembling the Nanox.ARC was likely to be at least $40,000 to $50,000 pe unit, e.g., upwards of 4-5 times greater than represented; and (ii) the Nanox.ARC was not comparable to the existing CT imaging, since it was unable to provide the same level of high resolution, the gold standard for medical imaging devices and that as a result, the prospective marketability and profitability of the Nanox.ARC, if any, was far more uncertain than investors were led to believe, Nano-X and the Individual Defendants failed to satisfy this duty. These

---

[2] *See* Nano-X patent US20190189383A as well as US20170301505A1

20

omissions give rise to Lead Plaintiff's claims because they render statements by the Company, including the ones enumerated *infra* ¶¶ 65-96 materially false and/or misleading.

64.     Pursuant to Item 105 of Regulation S-K, 17 C.F.R. § 229.105, Nano-X and the Individual Defendants had an affirmative, independent duty to disclose in the Prospectus the Company's most significant risk factors that make the offering speculative or risky.  By failing to disclose that:  (i) the actual costs for assembling the Nanox.ARC was likely to be at least $40,000 to $50,000 pe unit, e.g., upwards of 4-5 times greater than represented; and (ii) the Nanox.ARC was not comparable to the existing CT imaging, since it was unable to provide the same level of high resolution, the gold standard for medical imaging devices and that as a result, the prospective marketability and profitability of the Nanox.ARC, if any, was far more uncertain than investors were led to believe, Nano-X and the Individual Defendants failed to satisfy this duty.  Since, according to the Company's Registration Statements, Nano-X's "core digital X-ray source technology is the basis of [their] business. The Nanox.Arc currently under development is being designed to integrate our X-ray source technology into a medical imaging device for commercial use. **As a result, the success of [their] business plan is highly dependent on [their] ability to develop, manufacture and commercialize our X-ray source technology and related products and services, such as the Nanox.Arc and the Nanox.Cloud, and [their] failure to do so could cause [their] business to fail,"** the omissions described in this paragraph posed a grave threat to Nano-X's business and were among the most significant factors making an investment in Nano-X risky. These omissions give rise to Lead Plaintiff's claims because they render statements by the Company, including the ones enumerated *infra* ¶¶ 65-96 materially misleading.

## V.   THE MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

65.     The Class Period begins on August 21, 2020, when Nano-X securities began publicly trading on the NASDAQ pursuant to materially false and/or misleading statements or omissions in the IPO Registration Statement.

66.     In the IPO Registration Statement, signed by the Individuals Defendants, the Company, stated, in relevant part:

> As a first step to producing a new class of affordable medical imaging systems, we have focused on identifying and developing a novel X-ray source. Our X-ray source is **based on a novel digital microelectromechanical system ("MEMs") semiconductor cathode that we believe can achieve the same functionalities as legacy X-ray analog cathodes, while allowing for lower-cost production** than existing medical imaging systems.

> If cleared, **we plan to market and deploy the Nanox System globally at a substantially lower cost** than currently available medical imaging systems, such as computed tomography ("CT"), **because our digital X-ray source will allow the Nanox.ARC to have a simpler structure without the costly cooling equipment or the complex rotating mechanism** used in legacy CT devices. . . .

> ***

> **Digital X-ray source with the potential to significantly reduce the costs of medical imaging systems. We believe our digital X-ray source technology will allow us to manufacture the Nanox.ARC, if cleared, at substantially lower costs** compared to medical imaging systems that use a legacy analog X-ray source without sacrificing imaging quality. A lower cost device has the potential to substantially increase medical imaging availability and improve accessibility of early-detection services broadly across the globe.

> ***

> To further our vision, we have developed a working prototype of the Nanox.ARC, a medical imaging system incorporating our novel X-ray source, and we have developed a prototype of the Nanox.CLOUD, a companion cloud software. **If cleared, we plan to market and deploy the Nanox System broadly across the globe at a substantially lower cost compared to currently available medical imaging systems, such as CT**. We believe that, if cleared, our technology's relatively low cost will enable us to increase accessibility and affordability of early-detection medical imaging systems globally.

22

***

Our X-ray source is based on a novel digital MEMs semiconductor cathode that we believe can achieve the same functionalities as legacy X-ray analog cathodes, **while allowing for lower-cost production than existing medical imaging systems.**

***

Realizing that the X-ray tube technology has essentially not changed in more than 100 years and remains a significant source of complexity and cost-driver of existing X-ray-based medical imaging systems, **we developed a novel digital X-ray source that we believe addresses these drawbacks and will enable a new class of medical imaging systems that can be produced at a significantly lower cost than the existing systems.**

***

**We currently estimate the aggregate cost of purchasing and assembling the components of the Nanox.ARC will be approximately $8,000 to $12,000 per unit, assuming at least 15,000 Nanox.ARC units will be manufactured. We believe this will enable us to offer the Nanox System at a substantially lower cost than the cost of existing medical imaging systems based on analog X-ray sources**. For example, a new high-end CT scanner sells for $1,350,000 to $2,100,000, with an additional $35,000 to $100,000 for cardiac software, $15,500 to $35,000 for lung software and approximately 10% to 14% of the capital expenditure cost for annual support and maintenance services, reaching a total cost of ownership in the millions of dollars.

(Emphasis supplied).

67. The statements in ¶ 66 were materially false and/or misleading because Nano-X failed to disclose that: (i) the actual costs for assembling the Nanox.ARC was likely to be at least $40,000 to $50,000 pe unit, e.g., upwards of 4-5 times greater than represented; and (ii) the Nanox.ARC was not comparable to the existing CT imaging, since it was unable to provide the same level of high resolution, the gold standard for medical imaging devices. As a result, the prospective marketability and profitability of the Nanox.ARC, if any, was far more uncertain than investors were led to believe.

68. On September 15, 2020, Defendant Poliakine gave a virtual presentation at the Jeffries Asia Forum. He made the following statements:

23

The big problem that we are solving is that there are not enough medical imaging system in the world despite the fact that everybody understand that medical imaging is very important and despite the fact that the technology was invented over 100 years ago by Wilhelm Röntgen. Mainly speaking, Nanox is solving this problem. **We have a technology that actually take generations forward the imaging capabilities and making this medical imaging affordable, accessible and available.**

And as you can see on the right side of the screen, this is a full-body scanner. **This full-body scanner is estimated to be $10,000 only, which is way below any other alternatives. . .**

On the left side, you see Nanox action-size tube. So we took something that today is 1 meter and 100 kilos and made it into a very, very simple 10-centimeter beautiful tubes that can do everything that the huge analog tube can do. And because of that, we can also achieve efficiency. And this is the key point of the structuredness. **What you see here is the legacy tube, which is $150,000, going down all the way to approximately $100 when you do Nanox tube in mass production. So when you can move from $150,000 to $100, you can change the world.**

(Emphasis supplied).

69.     The statements in ¶ 68 were materially false and/or misleading because Nano-X failed to disclose that: (i) the actual costs for assembling the Nanox.ARC was likely to be at least $40,000 to $50,000 pe unit, e.g., upwards of 4-5 times greater than represented; and (ii) the Nanox.ARC was not comparable to the existing CT imaging, since it was unable to provide the same level of high resolution, the gold standard for medical imaging devices.  As a result, the prospective marketability and profitability of the Nanox.ARC, if any, was far more uncertain than investors were led to believe

70.     On September 15, 2020, Defendant Poliakine gave a virtual presentation at the Cantor Fitzgerald Virtual Global Healthcare Conference.  He made the following statements:

There is a huge global shortage in medical imaging devices. When everybody appreciates that medical imaging becomes more and more important in health care, the technology itself was invented by Wilhelm Röntgen 100 years ago, and yet, they're not enough. **Why? Because it's very expensive. It's very expensive because the core generator of X-ray by Wilhelm Röntgen is based on thermionic effect, very, very hot. How hot? Over 2,000 degrees Celsius.**

24

**In short, Nanox has the answer. We're doing exactly what Wilhelm Röntgen invented, but we are doing it with nanotechnology in room temperature.** And because of that, we can eliminate huge amount of the cost and create accessibility and **very low cost device all the way to $10,000 in mass production, and this is a full-body scanner that you see on the right side of this slide.**

**Now the next disruption, and this is where the investment houses should really pay attention, is our ability because of that, because of the fact that this is semiconductor, to move from $150,000 average cost to something that is less than $100** in mass production. And this is what happens when you move from one-off thermionic kind of 19th century technology into a 21st century technology of MEMs semiconductor. So when you can do that, when **you can just hold something in your hand that costs less than $100 versus $150,000**, 1 meter, you can now understand that the possibilities of propelling the global market with those little [flashlights] taking screenings of patients wherever they are, rich countries, poor countries, and upload these to the cloud is very, very feasible.

(Emphasis supplied).

71. The statements in ¶ 70 were materially false and/or misleading because Nano-X failed to disclose that: (i) the actual costs for assembling the Nanox.ARC was likely to be at least $40,000 to $50,000 pe unit, e.g., upwards of 4-5 times greater than represented; and (ii) the Nanox.ARC was not comparable to the existing CT imaging, since it was unable to provide the same level of high resolution, the gold standard for medical imaging devices. As a result, the prospective marketability and profitability of the Nanox.ARC, if any, was far more uncertain than investors were led to believe

72. On September 22, 2020, the Company issued and filed a press release, in the form of a presentation slide deck prepared for investors, titled "Dawn of early detection healthcare," on Form 6-K (the "Sept. 22, 2020 6-K"). The Sept. 22, 2020 6-K slide deck was used in a presentation at the Oppenheimer Fall Healthcare Life Sciences & MedTech Summit.

73. Slide 15 of the Sept. 22, 2020 6-K slide deck is Fig 1, as represented above.

74. The information contained in slide 15 (Fig. 1) of the Sept. 22, 2020 6-K presentation is materially false and/or misleading because the capabilities of the legacy X-ray tube and the purported capabilities of the Nano-X tube are different (as discussed *supra* ¶¶ 48-53) accordingly, a cost comparison of the two ($150,000 versus $100) is misleading because even if Nano-X is able to manufacture the Nanox.ARC (which includes the Nano X-ray tube) at a substantially lower cost, the Nanox.ARC is not expected to provide the same quality of imaging as a CT scanner with a legacy X-ray tube because the legacy X-ray tube and the purported Nano-X tube have different power and X-ray intensities, accordingly the Nano-X tube is not "substantially more cost effective," as Nano-X states.

75. Slide 16 of the Sept. 22, 2020 6-K slide deck is represented below:



76.     The information contained in slide 16 of the Sept. 22, 2020 6-K presentation is materially false and/or misleading because the capabilities of the CT with its legacy X-ray tube and the purported capabilities of the Nanox.ARC with the Nano-X tube are different (as discussed *supra* ¶¶ 48-53) accordingly, a cost comparison of the two ("cost of millions" versus "cost of tens of thousands") is misleading because even if Nano-X is able to manufacture the Nanox.ARC at a substantially lower cost, the Nanox.ARC is not expected to provide the same quality of imaging as a CT scanner with a legacy X-ray tube because the legacy X-ray tube and the purported Nano-X tube have different power and X-ray intensities, accordingly the Nanox.ARC will not "enable[] a system-level quantum leap," as Nano-X states.

77.     On November 9, 2020, the Company issued and filed a press release on a Form 6-K (the "Nov. 9, 2020 6-K").

78.     The Nov. 9, 2020 6-K quoted Defendant Poliakine as stating:

> With our proprietary, next-generation digital X-ray technology, we are developing an imaging system—the Nanox.ARC—**that is substantially less expensive th[a]n legacy X-ray machines . . .**

(Emphasis supplied).

79.     The statements in ¶ 78 were materially misleading because the capabilities of the CT scanner/legacy X-ray machine and the purported capabilities of the Nanox.ARC are different (as discussed *supra* ¶¶ 48-53) accordingly, a cost comparison of the two machines is misleading because even if Nano-X is able to manufacture the Nanox.ARC at a cost "substantially less expensive than legacy x-ray machines," the Nanox.ARC is not expected to provide the same quality of imaging as a CT scanner with a legacy X-ray tube.

80.     On December 3, 2020, the Company hosted the Nano-X Imaging Ltd. Investor Webinar.  At the webinar, Defendants Poliakine made the following statements:

27

Because of that reason—and this is another significant advantage that I—really I wanted to convey to you. **The cost associated with the source itself because of the heat generated, et cetera, is dramatically less when you talk about Nanox technology simply because it's mass-produced semiconductors that we estimate to be less than $100 in mass production versus $150,000 for average cost of a similar X-ray tube, and that's a big difference. When you can make something costs $100 versus $150,000, you can change the world.** And that's why when we push for availability and accessibility, we believe that once we completed the transfer for mass production, we can actually place those light bulbs, in a way, in different systems around the world and by that increase the accessibility to medical imaging.

(Emphasis Supplied).

81.  The statements in ¶ 80 are false and/or misleading because even if Nano-X is able to manufacture the Nano-X tube for "less than $100 in mass production" which is less than $150,000 for the legacy tube used in CT scanners, the two tubes are not "similar." As discussed *supra* ¶¶ 48-53, the legacy tube and the purported Nano-X tube have different power and X-ray intensities, which results in different image quality.

82.  On January 14, 2021, the Company gave a presentation at the Virtual 29th Annual J.P. Morgan Healthcare Conference. The Company used a presentation slide deck in connection with its presentation titled "Dawn of early detection healthcare." Slide 15 of slide deck presentation is Fig. 1, as represented above.

83.  The information contained in slide 15 (Fig. 1) of the J.P. Morgan Healthcare Conference slide deck presentation is materially false and/or misleading because the capabilities of the legacy X-ray tube and the purported capabilities of the Nano-X tube are different (as discussed *supra* ¶¶ 48-53) accordingly, a cost comparison of the two ($150,000 versus $100) is misleading because even if Nano-X is able to manufacture the Nanox.ARC (which includes the Nano X-ray tube) at a substantially lower cost, the Nanox.ARC is not expected to provide the same quality of imaging as a CT scanner with a legacy X-ray tube because the legacy X-ray tube and

the purported Nano-X tube have different power and X-ray intensities, accordingly the Nano-X

tube is not "substantially more cost effective," as Nano-X stated.

84.    In the SPO Registration Statement, signed by the Individual Defendants, the

Company stated, in relevant part:

> As a first step to producing a new class of affordable medical imaging systems, we have focused on identifying and developing a novel X-ray source. Our X-ray source is **based on a novel digital microelectromechanical system ("MEMs") semiconductor cathode that we believe can achieve the same functionalities as legacy X-ray analog cathodes, while allowing for lower-cost production** than existing medical imaging systems.
>
> ***
>
> If cleared, **we plan to market and deploy the Nanox System globally at a substantially lower cost** than currently available medical imaging systems, such as computed tomography ("CT"), **because our digital X-ray source will allow the Nanox.ARC to have a simpler structure without the costly cooling equipment or the complex rotating mechanism** used in legacy CT devices. . . .
>
> ***
>
> **Digital X-ray source with the potential to significantly reduce the costs of medical imaging systems. We believe our digital X-ray source technology will allow us to manufacture the Nanox.ARC, if cleared, at substantially lower costs** compared to medical imaging systems that use a legacy analog X-ray source without sacrificing imaging quality. A lower cost device has the potential to substantially increase medical imaging availability and improve accessibility of early-detection services broadly across the globe.
>
> ***
>
> To further our vision, we have developed a working prototype of the Nanox.ARC, a medical imaging system incorporating our novel X-ray source, and we have developed a prototype of the Nanox.CLOUD, a companion cloud software. **If cleared, we plan to market and deploy the Nanox System broadly across the globe at a substantially lower cost compared to currently available medical imaging systems, such as CT**. We believe that, if cleared, our technology's relatively low cost will enable us to increase accessibility and affordability of early-detection medical imaging systems globally.
>
> ***

> Our X-ray source is based on a novel digital MEMs semiconductor cathode that we believe can achieve the same functionalities as legacy X-ray analog cathodes, **while allowing for lower-cost production than existing medical imaging systems.**
>
> ***
>
> Realizing that the X-ray tube technology has essentially not changed in more than 100 years and remains a significant source of complexity and cost-driver of existing X-ray-based medical imaging systems, **we developed a novel digital X-ray source that we believe addresses these drawbacks and will enable a new class of medical imaging systems that can be produced at a significantly lower cost than the existing systems.**
>
> ***
>
> **We currently estimate the aggregate cost of purchasing and assembling the components of the Nanox.ARC will be approximately $8,000 to $12,000 per unit, assuming at least 15,000 Nanox.ARC units will be manufactured. We believe this will enable us to offer the Nanox System at a substantially lower cost than the cost of existing medical imaging systems based on analog X-ray sources**. For example, a new high-end CT scanner sells for $1,350,000 to $2,100,000, with an additional $35,000 to $100,000 for cardiac software, $15,500 to $35,000 for lung software and approximately 10% to 14% of the capital expenditure cost for annual support and maintenance services, reaching a total cost of ownership in the millions of dollars.

(Emphasis supplied).

85. The statements in ¶ 84 were materially false and/or misleading because Nano-X failed to disclose that: (i) the actual costs for assembling the Nanox.ARC was likely to be at least $40,000 to $50,000 pe unit, e.g., upwards of 4-5 times greater than represented; and (ii) the Nanox.ARC was not comparable to the existing CT imaging, since it was unable to provide the same level of high resolution, the gold standard for medical imaging devices. As a result, the prospective marketability and profitability of the Nanox.ARC, if any, was far more uncertain than investors were led to believe.

86. On March 2, 2021, the Company held its Fourth Quarter and Full Year 2020 Earnings Call. In the call, Defendant Poliakine made the following statements:

30

**Rand Poliakine:** Yes. So again, as mitigation for the Corona situation, which do not allow us to travel much, we are working very closely with Foxconn. However, we also found a local partner that is making as we speak the first 1,000 units. And it's done in full transparency also to go Foxconn.

**Steve Halper:** And does that change – there was a little bit of a change, obviously due to COVID, but does that change the economics of those first devices?

**Rand Poliakine:** No. I think, we also – **we always envisioned that the first 100 units will be a bit more expensive than the target cost of between $10,000 to $15,000, however, for the 1,000 units or the 900 units we are getting very close to the targeted price.** That's our estimation.

(Emphasis supplied).

87. The statements in ¶ 86 were materially false and/or misleading because the Nanox.ARC cannot be manufactured at a cost of "between $10,000 to $15,000," because (as discussed *supra* ¶¶ 54-58) the component parts of the Nanox.ARC would add up to a total cost of $40,0000 to $50,000, at the very least.

88. On March 17, 2021, the Company gave a virtual presentation at the 31st Virtual Annual Oppenheimer Healthcare Conference. Defendant Poliakine made the following statements:

> Now the next slide is actually taking us through the economics. And again, why Nano-X possibly can be really a game changer in the economical value or economical value creation, I would say. **And that's simply because of the fact that the legacy system, only the tube itself, cost average, about $150,000, while this tube from Nano-X estimated to cost in mass about USD 100. So when you can change from $150,000 to $100, then you can now understand better our mission to propel the globe with those little tubes because it's only $100 per one.**

(Emphasis supplied).

89. The statements in ¶ 88 were materially false and/or misleading because the capabilities of the legacy X-ray tube and the purported capabilities of the Nano-X tube are different (as discussed *supra* ¶¶ 48-53) accordingly, a cost comparison of the two ($150,000 versus $100) is misleading because even if Nano-X is able to manufacture the Nanox.ARC (which includes the

31

Nano X-ray tube) at a substantially lower cost, the Nanox.ARC is not expected to provide the same quality of imaging as a CT scanner with a legacy X-ray tube because the legacy X-ray tube and the purported Nano-X tube have different power and X-ray intensities.

90. On April 6, 2021, the Company filed its SEC Form 20-F Report for Fiscal Year Ended December 31, 2020 (the "2020 20-F"). The 2020 20-F was signed by Defendant Poliakine.

91. In the 2020 20-F, the Company stated, in relevant part:

> **We currently estimate the aggregate cost of purchasing and assembling the components of the Nanox.ARC will be approximately $8,000 to $12,000 per unit**, **assuming at least 15,000 Nanox.ARC units will be manufactured**. We believe this will enable us to offer the Nanox System at a substantially lower cost than the cost of existing medical imaging systems based on analog X-ray sources.

(Emphasis supplied).

92. The statements in ¶ 91 were materially false and/or misleading because the Nanox.ARC cannot be manufactured at a cost of "approximately $8,000 to $12,000 per unit" because (as discussed *supra* ¶¶ 54-58) the component parts of the Nanox.Arc would add up to a total cost $40,0000 to $50,000, at the very least.

93. On May 11, 2021, the Company held its First Quarter 2021 Earnings Call. In the call Defendant Poliakine made the following statements:

> **Ravi Misra:** And then just maybe on the manufacturing. Let's just—I just—I'm trying to kind of quantify the risk around your margin profile. If this thing gets to market as a glass tube you've said in the past kind of 10,000 to 12,000 kind of manufacturing cost. What kind of step-up or delta, what we see here between a system that had glass and versus there something that we should be contemplating there and our margin kind of there.

> **Rand Poliakine:** Well, I don't think so. I think currently, at least, our suppliers with the glass tube quoted $200 in mass production. That was the initial quote, and we believe it's reasonable. It may be a little bit more than the ceramic tube. But remember, we have only 5 tubes in the system. **So overall, I think the other component, like the power supply detector, mechanics are much more impactful in terms of meeting the $10,000 goals over time than the tubes themselves. So the answer is not going to have a big impact.** The impact that we were mitigating is really scalability and how quickly can we make big quantities?

32

(Emphasis supplied).

94. The statements in ¶ 93 were materially false and/or misleading because the Nanox.ARC cannot be manufactured at a cost of $10,000 because (as discussed *supra* ¶¶ 54-58) the component parts of the Nanox.ARC (some even referenced by Defendant Poliakine in this statement, e.g. detector, power supply) would add up to a total cost of $40,0000 to $50,000, at the very least.

95. On July 14, 2021, the Company gave a presentation at the Ladenburg Thalmann Virtual Healthcare Company. Defendant Poliakine made the following statement:

> Instead of cooling this 3,000° C, which is almost like a little nuclear power plant, with oil, et cetera, we have something very small that we hardly need to cool practically. **That makes a difference between a tube that costs maybe $50,000 to what we believe will be our cost in mass production of $100.**

96. The statements in ¶ 95 were materially false and/or misleading because the capabilities of the legacy X-ray tube and the purported capabilities of the Nano-X tube are different (as discussed *supra* ¶¶ 48-53) accordingly, a cost comparison of the two (here, $50,000 for the legacy, versus $100 for Nano-X's) is misleading. As discussed *supra* ¶¶ 48-53, the legacy tube and the purported Nano-X tube have different power and X-ray intensities.

## VI. THE TRUTH BEGINS TO EMERGE

97. On November 17, 2021, the Company issued and filed a press release on a Form 6-K (the "Nov. 17, 2021 6-K").

98. In the Nov. 17, 2021 6-K the Company disclosed, in relevant part, the following:

> The Division of Enforcement of the U.S. Securities & Exchange Commission (the "SEC") has notified the Company that it is conducting an investigation to determine whether there had been any violations of the federal securities laws. The Company has been providing documents and information and **has now received a subpoena from the SEC requesting that the Company provide documents and other information relating to the development cost of the Company's Nanox.ARC**

33

**prototypes, as well as the Company's estimate for the cost of assembling the final Nanox.ARC product at scale.** The Company is cooperating with the SEC in responding to its requests. The duration and outcome of this matter cannot be predicated at this time.

(Emphasis supplied).

99.     On this news, the Company's stock price declined $1.73, or 7.96%, from $21.74 on November 16, 2021, to $20.01 on November 17, 2021.

100.     On November 18, 2021, *Oppenheimer* Equity Research issued a report entitled, "Nano-X Imaging Ltd. FDA Strategy Murky; SEC Subpoena Received," questioning, "**[w]hy did SEC request reach subpoena stage? Remember, company commentary on $100 tube and $10,000 system cost at mass production . . . Sanctity of company commentary questionable given shifting explanations on deliverables. [] New SEC subpoena is concerning** . . ."

101.     On this news, the Company's stock price declined $1 or 5%, from $21.01 on November 17, 2021, to $19.01 on November 18, 2021.  On April 12, 2022, Nano-X stock closed at $10.99.

## VII.     <u>ADDITIONAL ALLEGATIONS DEMONSTRATING SCIENTER</u>

102.     By virtue of their positions at Nano-X, the Individual Defendants had actual knowledge or reckless disregard for the discrepancies between Nano-X's internal knowledge about the cost of assembling the Nanox.ARC and statements in Nano-X's Registration Statements and other public statements in SEC filings, investor presentations and earnings calls. Accordingly, the Individual Defendants had actual knowledge of materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, the Individual Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were

readily available to such Defendants. Said acts and omissions of such Defendants were committed willfully or with reckless disregard for the truth. In addition, each of the Individual Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

103. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Nano-X.

104. As a result of the dissemination of the false and misleading statements, the market price of Nano-X securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning true cost of the purchasing and assembling of the Nanox.ARC, concealed by the Individual Defendants, Lead Plaintiff and the other members of the Class purchased or otherwise acquired Nano-X's securities at artificially inflated.

**A.  Defendants Had No Basis to Make the Repeated Statements They Did Regarding the Estimate of the Aggregate Cost of Purchasing and Assembling the Components of the Nanox.ARC**

105. As discussed *supra* ¶¶ 48-62, there is no basis to make the repeated claims that the Nanox.ARC is "substantially lower cost compared to currently available medical imaging systems, such as computed tomography ("CT")," nor that the estimate aggregate cost of the Nanox.ARC is either around $10,000, or in the range of $8,000 to $12,000.

106. *First*, as discussed *supra* ¶¶ 48-53, because the capabilities of the Nanox.ARC differ substantially from those of a CT scanner, even if Nano-X is able to deliver a machine at a

"substantially lower cost," the comparison is inapposite and misleading because the Nanox.ARC cannot replace the imaging provided by the CT scanner.

107. *Second,* as discussed *supra* ¶¶ 54-58, because the various parts necessary to assemble the Nanox.ARC, including a digital detector, would cost, in the aggregate at the very least $40,000 to $50,000, the Company had no basis to represent that the Nanox.ARC could be assembled at such a low price.

108. Because the Nanox.ARC and its purported novel technology is the sole product of the Company and upon which, as admitted by Nano-X, the Company's success hinges, it is implausible that Defendants would not expressly know that: (1) the Nanox.ARC could not replace the CT scanner at a "substantially lower cost," and (2) the Nanox.ARC cannot be manufactured for $10,000, nor for between $8,000 to $12,000 because: (1) the cost of a detector of the requisite quality for the imaging purported to be created by the Nanox.ARC would cost anywhere between $35,000 to $70,000; and (2) the image quality of the Nano-X tube (for $100) and the legacy CT X-ray tube (approximately $150,000) are widely different and therefore the Nano-X tube could never replace the legacy X-ray tube and consequently the Nanox.ARC cannot replace the CT scanner.

109. Furthermore, at the May 11, 2021 First Quarter 2021 Earnings Call (discussed *supra* ¶ 93) Defendant Poliakine spoke of the other components of the Nanox.ARC (e.g. "power supply, detector") which further confirms that he was well-aware of the costs associated with other parts of the Nanox.ARC.

110. Alternatively, if somehow the facts listed in ¶ 108 were not expressly known to the Defendants, the Defendants were so extremely reckless in not knowing these material facts about their key product that scienter may be ascribed to them. The absence of their knowledge or reckless

disregard of these fact which are core to their medical imaging device, the Nanox.ARC (and thus presumptively known to those in the industry) bespeaks a complete lack of reasonable basis for their statements.

**B.** **The Company's Correspondence with the SEC Concerning the SEC Staff's Questioning of the Basis for Nano-X's Claim Regarding the Low Cost of the Nanox.ARC Supports an Inference of Scienter**

111. As discussed *supra* ¶¶ 34-36, the SEC Staff raised questions about the Company's claim regarding the low cost of the Nanox.ARC in December 2019—when the Company filed its first draft registration statement in connection with its IPO.

112. The letter was addressed to Defendant Poliakine. The Individual Defendants must have been made personally made aware of the SEC's inquiries and consulted in connection with responding to the SEC's specific inquiries about the Company's estimated cost of the Nanox.ARC. After the Staff raised concerns and asked for added information, the added disclosures (discussed *supra* ¶ 36) were included in the IPO and the SPO Registration Statements, both signed by the Individual Defendants.

113. Accordingly, in the course of their review of materials necessary to respond to the SEC's inquires the Defendants must have become aware that: (1) the Nanox.ARC could not replace the CT scanner at a "substantially lower cost," and (2) the Nano.ARC cannot be manufactured for $10,000, nor for between $8,000 to $12,000 because: (1) the cost of a detector of the requisite quality for the imaging purported to be created by the Nanox.ARC would cost anywhere between $35,000 to $70,000; and (2) the image quality of the Nano-X tube (for $100) and the legacy CT X-ray tube (approximately $150,000) are widely different and therefore the Nano-X tube could never replace the legacy X-ray tube and consequently the Nanox.ARC cannot replace the CT scanner.

114. Alternatively, if somehow these facts were not expressly known to the Defendants in connection with responding to the SEC's inquiries, the Defendants were so extremely reckless in not knowing these material facts about their key product that scienter may be ascribed to them.

**C. Defendants' Repeated Statements Concerning the Estimate of the Aggregate Cost of Purchasing and Assembling the Components of the Nanox.ARC Support an Inference of Scienter**

115. As discussed *supra* ¶¶ 65-96, in *at least* thirteen different occasions, throughout the Class Period, Defendants repeated statements about the purported cost benefits of the Nanox.ARC product versus legacy X-ray sources. Defendants spoke at length an in detail about the "novel digital microelectromechanical system ("MEMs") semiconductor cathode" that would allow for "lower-cost production," how it has the potential to "significantly reduce the costs of medical imaging systems," that it would be broadly deployed across the globe at a substantially lower cost," and that "estimate the aggregate cost of purchasing and assembling the components of the Nanox.ARC will be approximately $8,000 to $12,000 per unit," or $10,000.

116. As discussed *supra* ¶¶ 54-58, Defendants cannot manufacture the Nanox.ARC for $10,000 or between $8,000 to $12,000 because the aggregate cost of all the parts necessary to build the machine would add up to a total cost of $40,000 to $50,000, at least. Because Defendants chose to speak about a topic of critical importance to their business—their sole product, the Nanox.ARC, whose success specifically hinges on their ability to manufacture and assemble it at as significantly lower cost than the legacy X-ray—it is implausible that Defendants were not aware of crucial information in their possession that showed they could not manufacture the Nanox.ARC at the lower cost they claimed.

117. Where, as here, facts that contradict Defendants' public statements were available when the statements were made, it is reasonable to conclude that they had intimate knowledge of those facts or should have known of them. Therefore, the fact that they repeatedly spoke about

38

the lower cost of manufacture of the Nanox.ARC in SEC filings, the Registrations Statements and investor presentations bolsters the inference that the Defendants knew about this core aspect of their business.

**D.    The "Core Operations" Theory Supports an Inference of Scienter**

118.    The Nanox.System is Nano-X's sole product.  The proceeds raised from their IPO were allocated to:  (1) "manufactur[ing] the initial wave of Nanox.ARC units planned for global deployment . . .;" (2) "the shipping, installation and deployment costs of the Nanox System . . ." and (3) "continued research and development of the Nanox.ARC . . ."

119.    As the Company readily admits, "[o]ur core digital X-ray source technology is the basis of our business," [a]s a result, the success of our business plan is highly dependent on our ability to develop, manufacture and commercialize our X-ray source technology and related products and services, such as the Nanox.Arc and the Nanox.Cloud, and our failure to do so could cause our business to fail."

120.    Therefore, it is undisputed that the Nanox.ARC forms part of the core operations of Nano-X.  Facts pertaining to a Company's core operations—such as the development and cost of assembly of the Nanox.ARC—are so apparent that their knowledge is attributed to the Company and the Individual Defendants.

121.    Thus, it is implausible that the Defendants did not know that the cost estimate of the Nanox.ARC was false when by virtue of their positions they were required to have full knowledge of Nano-X's business relating to matters critical to the Company's long-term viability which would affect the Company's future source of income.

**E.**      **Defendants' Failure to Disclose Information That They Had a Clear Duty to Disclose Supports an Inference of Scienter**

122.      As discussed *supra* ¶¶ 63-64, pursuant to Item 303 of Regulation S-K, 17 C.F.R. § 229.303(ii) and Item 105 of Regulation S-K, 17 C.F.R. § 229.105, Defendants had an affirmative duty to disclose that: (i) the actual costs for assembling the Nanox.ARC was likely to be at least $40,000 to $50,000 pe unit, e.g., upwards of 4-5 times greater than represented; and (ii) the Nanox.ARC was not comparable to the existing CT imaging, since it was unable to provide the same level of high resolution, the gold standard for medical imaging devices. As a result, the prospective marketability and profitability of the Nanox.ARC, if any, was far more uncertain than investors were led to believe.

123.      Both conscious misbehavior and recklessness may be inferred when the duty to disclose is clear and no disclosure is made.

**F.**      **The Fact That the Company Continues to Push Back Shipment of the First 1,000 Units of the Nanox.ARC Supports an Inference of Scienter**

124.      In the IPO Registration Statement, the Company stated that was in negotiations with a global manufacturer to begin commercial production of the first 15,000 Nanox.Arc units. The Company also stated that: (1) they had introduced their working prototype of the Nanox.ARC in February 2020; (2) planned to deploy the first Nanox.ARC in the first half of 2021 and (3) were targeting a minimum installed base of at least 1,000 Nanox Systems in the second half of 2021 with the goal to finalize deployment of the initial 15,000 Nanox Systems by 2024.

125.      On manufacturing, the Company stated that they had "optimized the MEMs proprietary manufacturing process and currently use their own equipment in clean rooms located at the University of Tokyo to manufacture the MEMs X-ray chip and expected to obtain access to other clean rooms." On direct manufacturing agreements, the Company said that it had entered into direct arrangements with a manufacturer for the production of their X-ray tubes and expected

40

to rely on third-party manufacturers for the commercial production of the other components of theNanox.ARC. The Company also announced that on May 26, 2020 they had entered into a Contract Manufacturing Agreement with FoxSemicon Integrated Technology, Inc. ("FITI").

126. In the Company's 3Q 2020 November 9, 2020 Earnings Call, Defendant Poliakine represented that they were currently assembling 10 Nanox.ARC's in Israel, would conduct some tests, but once those were concluded they would ship the devices to their partners.

127. In a December 3, 2020 press release, the Company announced the "successful demonstration" of the Nanox.ARC prototype during the 2020 Radiology Society of North America's Virtual Annual Meeting. In a Nano-X Investor Webinar held the same day, Defendant Poliakine stated, "It's worth to mention that we are **planning to ship over 1,000 units** in the second half of the year. **And we are geared up totally from a capacity point of view."** (Emphasis supplied). Defendant Maayan added, "the Japanese factory that we currently operate is very much capable of supporting these 1,000 units that we intend to ship and deploy during 2021."

128. On March 2, 2021, the Company held its 4Q 2020 and Full Year Earnings Call and Defendant Poliakine stated, "basically making sure that our supply chain is in line with our plans, which are basically starting to ship products still with[in] this year, we talked about 1,000 units that will get into Q1 of 2022." Defendant Poliakine also made it clear that the Company was being proactive so as to prevent any delays as a result of the COVID-19 pandemic. He stated, "So again, as mitigation for the Corona situation, which do not allow us to travel much, we are working very closely with Foxconn. However, we also found a local partner that is making as we speak the first 1,000 units."

129. In the same call 4Q 2021 and Full Year Earnings Call, Defendant Poliakine definitely asserted:

41

So the construction work has done now as we speak. So again, just to clarify, for 2021 shipment, which is 1000 units, we are all set. We have secured actually everything we need in terms of chips and tubes and actually metal parts for the system. **So for the 1000 systems that we intend to make and ship this year or latest first quarter of next year, were set.**

(Emphasis supplied).

130. At the March 17, 2021 Virtual 31st Annual Oppenheimer Healthcare Conference, Defendant Poliakine reiterated the Company's readiness to ship out the 1,000 units, stating, "[a]nd the good news is that we are well underway to ship 1,000 units out of this production facility in Israel," "and again, just to remind you, we already signed in 13 countries**," "I think from shipment point of view, we'll be ready. Just to be clear, what we do is the final assembly is done in Israel. All the molded material, all the tubes. The chips are done overseas. And we are shipping all the parts, we already shipped from China and from Korea and Japan."** (Emphasis supplied).

131. However, in the Company's 1Q 2021 Earnings Call, held on May 11, 2021, Defendant Poliakine disclosed that the Company is pushing back its delivery of its first 1,000 units. The reason for the delays were indicated to be supply chain issues related to the ability of Nano-X's third-party supplier to provide ceramic tubes used to make the units.

132. Defendant Poliakine stated:

**Due to delays with the original third-party supplier** of the second-generation high-power ceramic tube, **which were compounded by the COVID-19 pandemic**, Nanox is currently working with two alternative tube suppliers for the multi-source system.

As a result, while **the Company does not expect to meet its previously announced milestone of shipment of 1,000 multi-source Nanox units by the first quarter of 2022**, Company believes that it will be able to gain ground during the year to reach the shipment milestone of 1,000 multi-source Nanox units during 2022, and possibly more, if the multi-source Nanox.ARC is cleared by the FDA and authorized by other similar regulatory agencies.

42

(Emphasis supplied).

133. While delays may appear reasonable—given the impact that the COVID-19 pandemic has had on supply chains of various industries—just a quarter before, as discussed *supra* ¶¶ 128-29, Defendant Poliakine claimed that all critical components (including tubes) were secured for the first 1,000 units.

134. The fact that Defendant Poliakine claimed just a quarter before that all components were sourced for production of 1,000 units, and then reversed himself a quarter after, stating that the Company needed to delay the entire production wave because of tube sourcing problems is indicative of scienter.

135. To date, per the Company's latest statements in presentations in March 2022 (the March 15, 2022 Oppenheimer 32nd Annual Healthcare Conference; the March 22, 2022 17th Annual Canaccord Genuity Musculoskeletal Conference), the 4Q 2021 Earnings Call held on March 31, 2022 and the Company's 4Q 2021 Financial Results, filed on Form 6-K on March 31, 20221, the 1,000 units have yet to be shipped.

**G.      The Fact that The Company Ceased Making the Repeated Statements Concerning the Estimate Cost of Purchasing and Assembling the Components of the Nanox.ARC, After Announcing Receipt of the SEC Subpoena, Supports an Inference of Scienter**

136. As discussed *supra* ¶¶ 33-36, in its December 4, 2019 Draft Registration Statement the Company did not disclose specific information concerning its claim that it would be able to market and deploy the Nanox System broadly across the globe at a substantially lower cost compared to currently available medical imaging systems.

137. As a result of the SEC's comments, in the IPO and SPO Registration, as well as other instances during the Class Period, Defendants made repeated specific statements concerning the estimate cost of assembling the Nanox.ARC.

138.    However, after the Company announced on November 17, 2021 that it had received the SEC subpoena concerning the cost of assembling the Nanox.ARC, Defendants discontinued making the explicit claims about the specific cost of assembling the Nanox.ARC.

139.    For example, at the March 15, 2022 Oppenheimer 32nd Annual Healthcare Conference, new CEO Erez Meltzer simply stated that their "core technology" would allow them to "decrease cost," and did not make any comment about the specific cost estimate.

140.    Similarly, at the March 22, 2022 Canaccord Genuity Musculoskeletal Conference, newly CFO Ran Daniel said that their "novel source" "enables cost reduction," also forgoing any comment about the specific cost estimate.

141.    Finally, in the Company's Q4 2021 Earnings Call, there was no mention of costs at all.

## VIII.    CONTROL PERSON ALLEGATIONS

142.    The Individual Defendants, by virtue of their high-level positions with Nano-X, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and had access to the adverse undisclosed information about the Company's business, operations, financial statements and present and future business prospects via access to internal corporate documents. The Individual Defendants participated in drafting, preparing, and/or approving the public statements and communications complained of herein and were aware of, or recklessly disregarded, the material misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.

143.    The Individual Defendants, as senior executive officers of Nano-X, were able to and did control the content of the various SEC filings, press releases, and other public statements in investor conferences pertaining to the Company during the Class Period. The Individual

44

Defendants had access to and were provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance and/or had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein.

144. As senior officers and controlling persons of a publicly-held company whose securities were, during the relevant time, registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to Nano-X's operations and business, and to correct any previously issued statements that were materially misleading or untrue when made, so that the market price of the Company's common stock would be based upon truthful and accurate information. The Individual Defendants' wrongful conduct during the Class Period as described herein violated these specific requirements and obligations.

145. In making the statements complained of herein, the Individual Defendants, who were senior officers and controlling persons of Nano-X, were acting on behalf of the Company in the regular course of business. Therefore, each of the statements made by the Individual Defendants is attributable to Nano-X.

## IX. LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS

146. Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Class. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

147. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Nano-X or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

148. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

149. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

150. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the Nano-X's business, operations and the cost and capabilities of the Nanox.ARC product;

- whether the Individual Defendants caused Nano-X to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

46

- whether the prices of Nano-X securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

151. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## X. NO STATUTORY SAFE HARBOR

152. The statutory safe harbor provided for forward-looking statements under the Private Securities Litigation Reform Act of 1995 does not apply to any of the allegedly false statements pleaded in this Amended Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not adequately identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Nano-X and the Individual Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Nano-X who knew that the statement was false when made.

47

## XI.    PRESUMPTION OF RELIANCE

153.    Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Nano-X and the Individual Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Nano-X's securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Lead Plaintiff and members of the Class purchased, acquired and/or sold Nano-X securities between the time Nano-X and the Individual Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

154.    Based upon the foregoing, Lead Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

155.    Alternatively, Lead Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Nano-X and the Individual Defendants omitted material information in their statements during the Class Period in violation of a duty to disclose such information, as detailed herein.

## COUNT I

### Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder Against all Defendants

156.    Lead Plaintiff incorporates the foregoing Paragraphs 1-155 by reference.

157.    During the Class Period, Nano-X and the Individual Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

158.    Nano-X and the Individual Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

159.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Nano-X securities. Lead Plaintiff and the Class would not have purchased Nano-X securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Nano-X and the Individual Defendants' misleading statements.

160.    As a direct and proximate result of Nano-X and the Individual Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of Nano-X securities during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

49

161. Lead Plaintiff incorporates the foregoing Paragraph 1-160. by reference.

162. The Individual Defendants acted as controlling persons of Nano-X within the meaning of Section 20(a) of the Exchange Act.

163. By virtue of their positions as officers and/or directors of Nano-X and/or their ownership of Nano-X securities, the Individual Defendants had the power and authority to, and did, cause Nano-X to engage in the wrongful conduct alleged.

164. As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of Nano-X securities during the Class Period.

165. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

**WHEREFORE,** Lead Plaintiff demands judgment against Defendants as follows:

A. Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying Lead Plaintiff as class representative and appointing Lead Plaintiff's counsel as Class Counsel;

B. Awarding Lead Plaintiff and other members of the Class damages together with interest thereon;

C. Awarding Lead Plaintiff and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, expert fees and other costs and disbursements; and

50

D.      Awarding Lead Plaintiff and other members of the Class such other and further

relief as the Court deems just and proper under the circumstances.

### DEMAND FOR TRIAL JURY

Lead Plaintiff hereby demands a trial by jury.

Dated:  April 12, 2022                    Respectfully submitted,

                                          POMERANTZ LLP

                                          */s/ Veronica V. Montenegro*
                                          Veronica V. Montenegro
                                          Jeremy A. Lieberman
                                          Marc I. Gross
                                          600 Third Avenue
                                          New York, New York 10016
                                          Telephone: (212) 661-1100
                                          Facsimile: (212) 661-8665
                                          vvmontenegro@pomlaw.com
                                          jalieberman@pomlaw.com
                                          migross@pomlaw.com

                                          *Counsel for Davian Holdings Limited and*
                                          *Proposed Lead Counsel for the Class*

                                          THE SCHALL LAW FIRM
                                          Brian Schall (*pro hac vice* forthcoming)
                                          2049 Century Park East, Suite 2460
                                          Los Angeles, California 90067
                                          Telephone: (424) 303-1964
                                          brian@schallfirm.com

                                          *Additional Counsel for Davian Holdings Limited*

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

| | ) | |
|---|---|---|
| In re Nano-X Securities Litigation | ) | |
| | ) | |
| | ) | |
| | ) | |
| _Plaintiff(s)_ | ) | |
| v. | ) | Civil Action No.  1:21-cv-05517-RPK-PK |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| _Defendant(s)_ | ) | |

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_  Itzhak Maayan
c/o CT Corporation System
28 Liberty Street, 42nd Floor
New York, NY 10005

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:  Veronica V. Montenegro
Pomerantz LLP
600 Third Avenue, 20th Floor
New York, NY 10016

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

DOUGLAS C. PALMER
_CLERK OF COURT_

Date: _____          _____
_Signature of Clerk or Deputy Clerk_

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.   1:21-cv-05517-RPK-PK

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ ____0.00____ .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

Print          Save As...          Reset