# Exhibit 5

Case 1:21-cv-05517-RPK-PK Document 51 Filed 09/02/22 Page 1 of 32 PageID #: 1318

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE NANO-X SECURITIES LITIGATION | Case No.  1:21-cv-05517-RPK-PK |

Case No.  1:21-cv-05517-RPK-PK

**ECF CASE**
**Electronically Filed**

**Oral Argument Requested**

**Date of Service: July 25, 2022**

**MEMORANDUM OF LAW IN SUPPORT OF THE DEFENDANTS'
MOTION TO DISMISS THE AMENDED CLASS ACTION
<u>COMPLAINT OF LEAD PLAINTIFF DAVIAN HOLDINGS LIMITED</u>**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .......................................................................................................... iii

PRELIMINARY STATEMENT ......................................................................................................1

STATEMENT OF FACTS ...............................................................................................................4

      A.     The Company and the Nanox.ARC .........................................................................4

      B.     Nanox's Estimate of the Cost to Develop the Nanox.ARC ....................................5

      C.     Nanox's Disclosures Regarding the Functionality of the Nanox.ARC ..................6

      D.     Nanox Discloses the SEC Subpoena .......................................................................6

ARGUMENT ...................................................................................................................................7

I.      STANDARDS ......................................................................................................................7

II.     PLAINTIFF FAILS TO ALLEGE ANY ACTIONABLE MISSTATEMENT OR
      OMISSION .........................................................................................................................8

      A.     Plaintiff Fails to Allege the Company's Cost Estimates Were False ......................8

      B.     Plaintiff Fails to Allege that Statements Regarding the Nanox.ARC's
            Capabilities Were False or Misleading ..................................................................10

      C.     The Allegedly False and Misleading Statements Are Protected by the
            PSLRA Safe Harbor and the Bespeaks Caution Doctrine ....................................13

      D.     Opinion Statements Are Not Actionable ...............................................................16

      E.     General Statements of Puffery and Expressions of Corporate Optimism
            Are Not Actionable .................................................................................................18

      F.     Plaintiff Fails to Plead a Violation of Regulation S-K .........................................18

III.    PLAINTIFF FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER .................19

IV.    PLAINTIFF FAILS TO PLEAD LOSS CAUSATION ...................................................23

V.     PLAINTIFF'S RULE 10B-5(A) AND (C) CLAIMS SHOULD BE DISMISSED ..........24

VI.    PLAINTIFF'S SECTION 20(A) CLAIMS SHOULD BE DISMISSED ........................25

CONCLUSION ..............................................................................................................................25

**TABLE OF AUTHORITIES**

Page(s)

**CASES**

*In re Alkermes Public Ltd. Co. Securities Litigation*,
   523 F. Supp. 3d 283 (E.D.N.Y. 2021), *aff'd sub nom. Midwest Operating
   Engineers Pension Trust Fund v. Alkermes Public Ltd. Co.*, No. 21-801-cv, 2021
   WL 5782079 (2d Cir. Dec. 7, 2021) .................................................................................20

*Arkansas Public Employees Retirement System v. Bristol-Myers Squibb Co.*,
   28 F.4th 343 (2d Cir. 2022) ...........................................................................................7

*In re AT&T/DirecTV Now Securities Litigation*,
   480 F. Supp. 3d 507 (S.D.N.Y. 2020), *appeal docketed*, No. 21-2698 (2d Cir. Oct.
   27, 2021) .........................................................................................................................18

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007).............................................................................................25

*In re Australia & New Zealand Banking Group Ltd. Securities Litigation*,
   No. 08 Civ. 11278(DLC), 2009 WL 4823923 (S.D.N.Y. Dec. 14, 2009)..........................9

*In re Avon Products, Inc. Securities Litigation*,
   No. 05 Civ. 6803(LAK)(MHD), 2009 WL 848017 (S.D.N.Y. Feb. 23, 2009),
   *report and recommendation adopted*, No. 05 Civ. 06803 (LAK), 2009 WL
   10698359 (S.D.N.Y. Mar. 18, 2009) ...............................................................................16

*In re Axis Capital Holdings Ltd., Securities Litigation*,
   456 F. Supp. 2d 576 (S.D.N.Y. 2006).............................................................................10

*In re Barrick Gold Corp. Securities Litigation*,
   341 F. Supp. 3d 358 (S.D.N.Y. 2018).............................................................................15

*In re Bayou Hedge Fund Litigation*,
   534 F. Supp. 2d 405 (S.D.N.Y. 2007), *aff'd sub nom. South Cherry Street, LLC v.
   Hennessee Group LLC*, 573 F.3d 98 (2d Cir. 2009)........................................................20

*In re Bemis Co. Securities Litigation*,
   512 F. Supp. 3d 518 (S.D.N.Y. 2021)........................................................................14, 15

*Canez v. Intelligent Systems Corp.*,
   No. 19-CV-3949 (RPK) (CLP), 2021 WL 3667012 (E.D.N.Y. Aug. 18, 2021) ...............20

*Central States, Southeast & Southwest Areas Pension Fund v. Federal Home Loan Mortgage Corp.*,
543 F. App'x 72 (2d Cir. 2013) .................................................................................24

*Chapman v. Mueller Water Products, Inc.*,
466 F. Supp. 3d 382 (S.D.N.Y. 2020).......................................................................20

*In re China XD Plastics Co. Securities Litigation*,
No. 14-cv-05308 (GBD), 2016 WL 1241522 (S.D.N.Y. Mar. 23, 2016)...........................9

*Dalberth v. Xerox Corp.*,
766 F.3d 172 (2d Cir. 2014).....................................................................................24

*Das v. Rio Tinto PLC*,
332 F. Supp. 3d 786, 805 (S.D.N.Y. 2018).................................................................7

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)...........................................................................3, 19, 20

*Emerson v. Mutual Fund Series Trust*,
393 F. Supp. 3d 220 (E.D.N.Y. 2019) .......................................................................13

*In re Fed Ex Corp. Securities Litigation*,
517 F. Supp. 3d 216 (S.D.N.Y. 2021)............................................................14, 15, 16

*Glaser v. The9, Ltd.*,
772 F. Supp. 2d 573 (S.D.N.Y. 2011).......................................................................21

*Halperin v. eBanker USA.com, Inc.*,
295 F.3d 352 (2d Cir. 2002).....................................................................................14

*In re HEXO Corp. Securities Litigation*,
524 F. Supp. 3d 283 (S.D.N.Y. 2021)..................................................................15, 22

*In re Initial Public Offering Securities Litigation*,
383 F. Supp. 2d 566, *opinion supplemented on reconsideration*, 399 F. Supp. 2d
261 (S.D.N.Y. 2005), *aff'd sub nom. Tenney v. Credit Suisse First Boston Corp.*,
No. 05-3430-CV, 2006 WL 1423785 (2d Cir. May 19, 2006) ....................................15, 16

*Janbay v. Canadian Solar, Inc.*,
No. 10 Civ. 4430(RWS), 2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) .........................24

*Kalnit v. Eichler*,
264 F.3d 131 (2d Cir. 2001).....................................................................................19

*Kalnit v. Eichler*,
85 F. Supp. 2d 232 (S.D.N.Y. 1999).........................................................................25

iv

*Lentell v. Merrill Lynch & Co.*,
 396 F.3d 161 (2d Cir. 2005).................................................................................................23

*Lipow v. Net1 UEPS Technologies, Inc.*,
 131 F. Supp. 3d 144 (S.D.N.Y. 2015)...................................................................................23

*Livingston v. Cablevision Systems Corp.*,
 966 F. Supp. 2d 208 (E.D.N.Y. 2013) ..................................................................................25

*Marcu v. Cheetah Mobile Inc.*,
 No. 18-CV-11184 (JMF), 2020 WL 4016645 (S.D.N.Y. July 16, 2020) ........................21

*Medina v. Tremor Video, Inc.*,
 640 F. App'x 45 (2d Cir. 2016) .............................................................................................19

*Meyer v. Greene*,
 710 F.3d 1189 (11th Cir. 2013) ...........................................................................................24

*In re New Energy Systems Securities Litigation*,
 66 F. Supp. 3d 401 (S.D.N.Y. 2014)....................................................................................24

*In re Nokia Corp. Securities Litigation*,
 No. 19-cv-3509, 2021 WL 1199030 (S.D.N.Y. Mar. 29, 2021)........................................14

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
 575 U.S. 175 (2015).....................................................................................................3, 16, 17, 18

*Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*,
 11 F.4th 90 (2d Cir. 2021) ....................................................................................................25

*Portannese v. Donna Karan International, Inc.*,
 No. 97-CV-2011 CBA, 1998 WL 637547 (E.D.N.Y. Aug. 14, 1998) ..............................13

*Prime Mover Capital Partners L.P. v. Elixir Gaming Technologies, Inc.*,
 793 F. Supp. 2d 651 (S.D.N.Y. 2011)...................................................................................22

*Rombach v. Chang*,
 355 F.3d 164 (2d Cir. 2004)............................................................................................7, 18

*SEC v. Rio Tinto plc*,
 No. 21-2042, 2022 WL 2760323 (2d Cir. July 15, 2022)...................................................25

*Shetty v. Trivago N.V.*,
 796 F. App'x 31 (2d Cir. 2019).......................................................................................21, 22

*Silsby v. Icahn*,
 17 F. Supp. 3d 348 (S.D.N.Y. 2014), *aff'd sub nom. Lucas v. Icahn*, 616 F. App'x
 448 (2d Cir. 2015)..................................................................................................................12

*In re Skechers USA, Inc. Securities Litigation*,
    444 F. Supp. 3d 498 (S.D.N.Y. 2020).................................................................................10

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016)...................................................................................4, 17

*Woolgar v. Kingstone Cos.*,
    477 F. Supp. 3d 193 (S.D.N.Y. 2020)...............................................................................17

**STATUTES**

15 U.S.C. § 78j(b).................................................................................................................7, 25

15 U.S.C. § 78t(a).....................................................................................................................25

15 U.S.C. § 78u-4(b)..................................................................................................................7

15 U.S.C. § 78u-5.........................................................................................................13, 15, 16

**RULES**

Federal Rule of Civil Procedure 9(b)......................................................................................2, 7

**REGULATIONS**

17 C.F.R. § 229.105...................................................................................................................22

17 C.F.R. § 229.303...................................................................................................................22

17 C.F.R. § 240.10b-5............................................................................................................7, 24

**OTHER AUTHORITIES**

*Digital X-Ray Detector Panel Price Guide*, Block Imaging,
    https://info.blockimaging.com/dr-panel-price-cost-guide (last visited July 22,
    2022) ...................................................................................................................................10

*Tomosynthesis*, Wikipedia: The Free Encyclopedia (June 29, 2022),
    https://en.wikipedia.org/wiki/Tomosynthesis...................................................................13

Defendants Nano-X Imaging Ltd. ("Nanox" or the "Company"), Ran Poliakine and Itzhak Maayan (together, "Individual Defendants") submit this memorandum of law in support of their motion to dismiss Lead Plaintiff's Amended Complaint ("Compl.") (ECF No. 24).

## PRELIMINARY STATEMENT

Nanox, based in Israel, is seeking to introduce a new class of medical imaging systems that would be more affordable and accessible globally than existing options. Nanox is currently developing a commercial-grade digital X-ray source that it plans to incorporate into a tomosynthesis imaging system called the Nanox.ARC. What originally sparked this action was Nanox's August 19, 2021 announcement that it had "received a request for additional information" from the U.S. Food & Drug Administration ("FDA") regarding a submission relating to the multi-source Nanox.ARC. Once appointed lead plaintiff, apparently recognizing the obstacles to forging a securities fraud claim out of this routine regulatory development, but still interested in suing Defendants, Plaintiff jettisoned *all* of the initial claims.

The new claims asserted in the 57-page Amended Complaint can be summarized in a few sentences. First, the Company estimated that, assuming it obtained regulatory clearance and reached a stage that it was mass-producing the Nanox.ARC, the cost of the components for and assembling the Nanox.ARC would be $8,000 to $12,000. (Compl. ¶¶ 66-96.) Plaintiff speculates that this estimate would be "impossible" to achieve. Second, the Company disclosed its plan to market the Nanox.ARC at a lower cost than currently available medical imaging systems, such as computed tomography ("CT") systems. Plaintiff alleges that mentioning the Company's system in the same sentence as a CT system was misleading because the two technologies do not have the same capabilities, even though the Defendants never claimed they did. (*Id.*)

Plaintiff has not pleaded any claim under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78(j)(b), or Rule 10b-5 promulgated thereunder, 17 C.F.R. §

240.10b-5. These claims are subject to the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), and Federal Rule of Civil Procedure 9(b), which Plaintiff has not come close to meeting.

*First*, under the PSLRA, Plaintiff is required, but has failed, to plead each statement alleged to be misleading, the reasons why it believes the statement is misleading and all the facts on which that belief was formed. (*See infra* Section II.) With respect to the cost estimate theory, Plaintiff speculates that the most expensive part of an X-ray system is the X-ray "detector" and that the Nanox.ARC will require a top-of-the-line detector. Plaintiff alleges that such premium detectors would cost $35,000 to $70,000, prices it obtained from the internet site of a company offering off-the-shelf X-ray detectors to healthcare providers. Plaintiff offers no basis, however, for its belief that the Nanox.ARC would require one of the detectors offered on that site, let alone what price the Company would pay for detectors for a mass-production run of 15,000 units.

With respect to the second theory, Plaintiff has not alleged any misleading statement comparing the Nanox.ARC and CT scanners. The Company disclosed, on the very first page of its IPO registration statement, that the Nanox.ARC would be a low-cost *tomosynthesis* imaging system, not a CT system costing over $1 million. The Complaint itself alleges that tomosynthesis and CT scanning are very different technologies. While Plaintiff derides tomosynthesis systems as having lower resolution or more limited depth of field than CT scanners, it cannot allege that the Company inaccurately described the system it was developing.

*Second*, the statements Plaintiff claims were misleading, (Compl. ¶¶ 66-96), are not actionable under the securities laws for several reasons. First, the statements are forward-looking statements—such as manufacturing cost estimates and statements about the future market for the Nanox.ARC—that were accompanied by extensive cautionary language. These statements are

immune from liability under the statutory safe harbor for forward-looking statements or the common-law bespeaks caution doctrine. (*See infra* Section II.C.) Second, many of the statements are also statements of opinion, but Plaintiff failed to allege that the opinions were either not honestly held or that Defendants omitted important information necessary to understand the opinions, as required under *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015). (*See infra* Section II.D.) Still other statements merely reflect Defendants' enthusiasm for the system the Company is developing, which are immaterial as a matter of law and cannot form the basis of a Section 10(b) claim. (*See infra* Section II.E.)

Plaintiff attempts, half-heartedly, to allege that the Company omitted to disclose certain known trends and risks, in violation of SEC Regulation S-K, Items 105 and 303. But Plaintiff fails to plead the existence of a trend or risk requiring disclosure, let alone that any of the Individual Defendants had actual knowledge of one. And, in any event, Plaintiff ignores that the Company did, in fact, make extensive risk disclosures. (*See infra* Section II.F.)

*Third*, Plaintiff has failed to allege facts giving rise to a "strong inference" of scienter, as required under the PSLRA, meaning an inference that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (*See infra* Section III.) The fraud Plaintiff imagines—that Defendants invested millions into a system that, according to Plaintiff, will cost too much and will never work, then concealed the fraud so poorly that anyone could unravel it with superficial internet searches—cannot satisfy this standard. Plaintiff alleges no motive for the supposed fraud. And while Plaintiff offers various theories for why Defendants must have known facts contradicting their statements, it failed to allege any particularized facts identifying information known to Defendants that was contrary to any of their public statements.

3

*Fourth*, Plaintiff fails to allege loss causation. (*See infra* Section IV.) Plaintiff relies on a corrective disclosure theory, alleging it suffered losses when the "truth" became public. The only alleged corrective disclosures, however, are the Company's announcement of an SEC subpoena for documents concerning the cost estimates, as well as an analyst report commenting on that announcement. (Compl. ¶¶ 6, 98-100.) Neither statement reveals any previously concealed truth about the cost estimates. Plaintiff also alleges no corrective disclosure regarding its theory that Defendants misleadingly compared the Nanox.ARC to existing CT scanners.

*Finally*, the "control person" claims under Section 20(a) of the Exchange Act should be dismissed because the Complaint: (1) fails to plead any primary liability claim; (2) improperly attempts to plead primary and control person liability as to the same defendants for the same conduct; and (3) fails to allege how the Individual Defendants controlled any violation other than through their positions at Nanox, which is insufficient. (*See infra* Section VI.)

For the reasons set forth below, the Complaint should be dismissed with prejudice.

## STATEMENT OF FACTS

### A. The Company and the Nanox.ARC

Nanox is a "development-stage company that designs, produces, and seeks to commercialize digital X-ray source technology for the medical imaging industry worldwide." (Compl. ¶ 21.) Nanox's goal is to make medical imaging more accessible globally. (Ex. 1 at 1-2.)[1] To that end, Nanox is seeking to commercialize a multi-source digital x-ray imaging system capable of taking images from several angles. (*See, e.g.*, Compl. ¶ 30; Ex. 1 at 1.)

---

[1] References to "Ex. __" are to the exhibits attached to the accompanying Declaration of Christopher P. Malloy. On this motion to dismiss, the Court may "consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff upon which it relied in bringing the suit." *Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016) (citation omitted).

4

As part of its regulatory strategy, Nanox initially sought approval from the FDA for a version of its system, called the Nanox.CART, which utilizes a single x-ray source and was intended for use only for x-rays of hands, wrists, and fingers,[2] (*see, e.g.*, Ex. 2 at 31-33; Ex. 16 at 5), while making clear that it "plan[ned] to submit an additional 510(k) application . . . with respect to the multiple-source Nanox.ARC . . . which, if cleared, will be our commercial imaging system." (*See, e.g.*, Ex. 1 at 3.) The Company received FDA approval for the Nanox.CART in April 2021. (Compl. at ¶ 31.) The Company submitted an FDA application for a version of the multi-source Nanox.ARC in June 2021, but has yet to receive approval for this product. (*Id.* ¶ 32.)

**B.     Nanox's Estimate of the Cost to Develop the Nanox.ARC**

Nanox conducted an IPO in August 2020 and a Second Public Offering ("SPO") in February 2021. (Compl. ¶¶ 43-47.) In the IPO and SPO registration statements, and in subsequent disclosures, Nanox estimated the cost to acquire the components for and assemble the Nanox.ARC, once development was completed, regulatory approvals were obtained, and the system reached mass production. (*See*, *e.g.*, Compl. ¶ 54 (estimating the cost of the Nanox.ARC as "$10,000 in mass production"); Ex. 1 at 87 ("We currently estimate the aggregate cost of purchasing and assembling the components of the Nanox.ARC will be approximately $8,000 to $12,000 per unit, assuming at least 15,000 Nanox.ARC units will be manufactured.").)

These statements were accompanied by extensive risk disclosures alerting investors that the Company had not yet manufactured the product at scale, and that it may not be able to do so at the anticipated costs, including, among other things, the following warnings:

---

[2] The 510(k) premarket FDA submissions for the Nanox.CART and the Nanox.ARC sought approval on the basis that those devices were "substantially equivalent" to devices that have already been approved. *See* Ex. 16 at 11 (510(k) determination of "substantial equivalence" for Nanox.CART). *See also* Ex. 2 at 31-33 (explaining the 510(k) submission and Nanox's regulatory strategy).

5

- "Our estimated manufacturing costs of the Nanox.ARC are subject to a number of assumptions and uncertainties and the actual cost per unit could vary significantly from our estimate, which would have a negative impact on our business" (Ex. 1 at 87; Ex. 4 at 87);

- "[W]e have not produced any of the approximately 15,000 Nanox.ARC units planned for the initial global deployment under the contract manufacturing agreement with FoxSemicon Integrated Technology, Inc., a subsidiary of Foxconn ("FITI"). Even if we are able to do so, we may not be able to manufacture the Nanox.ARC at the low costs needed to support our business models . . . ." (Ex. 1 at 10; Ex. 4 at 13); and

- "We may experience development or manufacturing problems and higher costs, or delays that could limit our revenue, if any, or increase our losses . . . ." (Ex. 1 at 17; Ex. 4 at 21).[3]

## C. Nanox's Disclosures Regarding the Functionality of the Nanox.ARC

Nanox disclosed prominently on the first page of the IPO offering documents: "Subject to receiving regulatory clearance, the first version of the Nanox.ARC that we expect to introduce to the market will be a three-dimensional ("3D") tomosynthesis imaging system." (Ex. 1 at 1.) Plaintiff acknowledges that tomosynthesis and computed tomography are distinct technologies. (*See* Compl. ¶ 50.) Although Defendants hope to make medical imaging more accessible and affordable than existing systems, such as CT systems (*see* Compl. ¶ 66), Defendants have never stated that the Nanox.ARC will perform the same imaging as a CT scanner.

## D. Nanox Discloses the SEC Subpoena

On November 17, 2021, the Company disclosed that it had received a subpoena from the SEC requesting documents regarding "the development cost of the Company's Nanox.ARC prototypes, as well as the Company's estimate for the cost of assembling the final Nanox.ARC product at scale." (Compl. ¶¶ 6, 98.) The Company further disclosed that it was "cooperating with the SEC in responding to its requests." (Ex. 5 at 1.)

---

[3] In addition to those identified above, the Company made additional wide-ranging risk disclosures covering risks related to the business, government regulations, the offerings, and more. (*See, e.g.*, Ex. 1 at 10-54; Ex. 4 at 13-58.)

6

# ARGUMENT

## I.     STANDARDS

To state a claim for securities fraud under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, Plaintiff must plead: "(1) a misstatement or omission of material fact; (2) scienter; (3) a connection with the purchase or sale of securities; (4) reliance; (5) economic loss; and (6) loss causation." *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 351-52 (2d Cir. 2022).

Plaintiff must also meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA. *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004). "[A]llegations of material misstatements must be stated with particularity," *Bristol-Myers*, 28 F.4th at 353 (citation omitted), and Plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading and, if an allegation regarding the statement or omission is made on information and belief, [] state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Plaintiff must also "state with particularity [the] facts giving rise to a strong inference that the defendant acted with the required state of mind." *Rombach*, 355 F.3d at 176 (quoting 15 U.S.C. § 78u-4(b)(2)).

Finally, "where there are multiple defendants, the complaint must allege that each particular defendant 'made' the material misstatements." *See Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 805 (S.D.N.Y. 2018) (citing *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 141 (2011)). Here, the Complaint asserts claims against Defendant Maayan based on a number of purportedly misleading statements he is not alleged to have "made," (*see* Compl. ¶¶ 68, 70, 72-6, 78, 80, 82, 86, 88, 90, 93, 95), and, accordingly, any claims against Defendant Maayan based on those statements should be dismissed.

## II. PLAINTIFF FAILS TO ALLEGE ANY ACTIONABLE MISSTATEMENT OR OMISSION

### A. Plaintiff Fails to Allege the Company's Cost Estimates Were False

Plaintiff alleges that various statements regarding the Company's cost estimate for the Nanox.ARC in mass production were misleading (Compl. ¶¶ 66-69, 70-1, 84-7, 90-4), because "this price estimate is impossible when considering the different parts required by an X-ray system" (Compl. ¶ 56). Plaintiff focuses on one part of the device, the detector, and contends the price of that part is so high that the Company's estimate must have been false. But Plaintiff has not alleged facts that would provide a basis for this sweeping claim.

Plaintiff cites the Company's FDA application for the single-source Nanox.CART, which identifies a "DRTECH Exprimer detector." Without citing a source, Plaintiff alleges that detector costs "$20,000." (Compl. ¶ 57.) Plaintiff goes on to speculate that the Nanox.ARC would require "higher quality detectors [that] cost anywhere between $35,000 to $70,000." *Id.* Neither of these purported "facts" support a conclusion that the Company's estimates about the cost of the Nanox.ARC were false when made.

First, the cost of the detector used in the Nanox.CART says nothing about the cost of the detector that will be used in the Nanox.ARC. The Nanox.CART was not designed with the intention of being the Company's commercial, mass-produced device. As the Company publicly disclosed, the multi-source Nanox.ARC, not the single-source Nanox.CART, will be its commercial device. (*See, e.g.*, Ex. 6 at 6; Ex. 3 at 4.)

The cost estimates Plaintiff alleges were misleading relate to the cost of the components for and assembling the Nanox.ARC *in mass production*. (*See*, *e.g.*, Compl. ¶ 54 (estimating the cost of the Nanox.ARC as "$10,000 *in mass production*.") (emphasis added); Ex. 1 at 87 ("We currently estimate the aggregate cost of purchasing and assembling the components of the

8

*Nanox.ARC* will be approximately $8,000 to $12,000 per unit, *assuming at least 15,000 Nanox.ARC units will be manufactured*.") (emphasis added).) The Complaint does not allege what detector was planned for the mass production version of the Nanox.ARC under development, let alone the estimated cost of that detector when sourced for a production run of 15,000 or more units. *See In re Austl. & N.Z. Banking Grp. Ltd. Sec. Litig.*, No. 08 Civ. 11278(DLC), 2009 WL 4823923, at *6 (S.D.N.Y. Dec. 14, 2009) ("Allegations that are conclusory or unsupported by factual assertions are insufficient." (citation omitted)).

In *In re China XD Plastics Co. Securities Litigation*, No. 14-cv-05308 (GBD), 2016 WL 1241522 (S.D.N.Y. Mar. 23, 2016), the court recognized that the type of apples-to-oranges comparison Plaintiff employs is no basis for alleging securities fraud. There, the complaint alleged that the defendants' SEC filings were false because they were inconsistent with defendants' filings with the Chinese securities regulator (the "SAIC"). *Id.* at *4. However, the SEC filings were on a consolidated basis, while SAIC filings were made for each subsidiary. The court dismissed the claims, concluding "[i]t is not reasonable to infer that China XD's SEC filings must be false based upon a comparison to less than a complete set of its subsidiaries' SAIC filings. Any such allegation is pure speculation not supported by the factual allegations and filings incorporated by reference." *Id.* at *6. Here, Plaintiff likewise cannot plead a material misstatement about the Nanox.ARC by pointing to the cost of a detector used for a separate device, not designed to be mass produced, without alleging a factual basis for concluding this is a proper comparison (which it cannot do).

Plaintiff's contention that the Nanox.ARC could need an even more expensive X-ray detector than the one specified for the Nanox-CART is just as speculative. Plaintiff offers no basis for alleging that the Nanox.ARC would require a "higher quality detector[]," and its

contention that such "detectors cost anywhere between $35,000 to $70,000" is misleading at best. (*See* Compl. ¶ 57.) Plaintiff apparently scoured the internet for any reference to the price charged for X-ray detectors and found a price guide from a Michigan-based company that specializes in selling refurbished imaging equipment to healthcare providers, not X-ray system manufacturers. (*See Digital X-Ray Detector Panel Price Guide*, Block Imaging, https://info.blockimaging.com/dr-panel-price-cost-guide (last visited July 22, 2022). Plaintiff does not allege a basis for concluding the "premium" X-ray detectors for sale on this site would be appropriate or required for the Nanox.ARC, or whether the company (1) sells the parts in volumes sufficient to meet a mass production run of the Nanox.ARC, and (2) what the parts would cost in such volumes.[4] Plaintiff's factual allegations, untethered from the content of the cost estimate disclosure, are insufficient. *See In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 519-20 (S.D.N.Y. 2020) (dismissing claims where allegations of falsity were "untethered" from the factual content of the at-issue statements).

**B.** **Plaintiff Fails to Allege that Statements Regarding the Nanox.ARC's Capabilities Were False or Misleading**

Plaintiff has not alleged any misleading statement suggesting that the Nanox.ARC would have the same capabilities as a CT scanner. In determining whether a statement is materially misleading, the "central inquiry . . . is whether the defendants' representations, taken together and in context, would have misled a reasonable investor about the nature of the securities."' *In re Axis Cap. Holdings Ltd., Sec. Litig.*, 456 F. Supp. 2d 576, 588 (S.D.N.Y. 2006).

---

[4] Plaintiff also alleges, in conclusory fashion, that none of Nanox's patent applications "concern technology that would explain how the Nanox.ARC could be assembled for the lower-cost of $10,000." (Compl. ¶ 60.) This is plainly incorrect, as certain of Nanox's patents relate to its cold cathode technology, as well as assembly of tubes from that technology, which Nanox has repeatedly disclosed is the basis for the lower cost of the Nanox.ARC. (*See, e.g.*, Ex. 8 at 6 ("The cost associated with the source itself because of the heat generated, et cetera, is dramatically less when you talk about Nanox technology simply because it's mass-produced semiconductors that we estimate to be less than $100 in mass production versus $150,000 for average cost of a similar X-ray tube[.]").)

10

Here, Plaintiff alleges that the Company stated, for example, that it "plan[s] to market and deploy the Nanox System broadly across the globe at a substantially lower cost compared to currently available imaging systems, such as computed tomography ('CT')," and that its "technology's relatively low cost has the potential to enable use to increase the accessibility and affordability of early-detection medical imaging systems globally." (Compl. ¶ 48; *see also id.* ¶¶ 66-96.) Plaintiff alleges that the "import" of these statements was that the "Nanox.ARC can replace the CT and do so at much lower cost," when in reality "the purported capabilities of the Nanox.ARC are not the same as the capabilities of the CT scanner." (Compl. ¶¶ 48-49.)

There is nothing false about these statements, however. Even if the Nanox.ARC will cost $40,000 to $50,000, as Plaintiff claims, (Compl. ¶¶ 116), that cost would still be orders of magnitude less than a CT scanner, which "sells for $1,350,000 to $2,100,000" or more. (Compl. ¶ 66.) Furthermore, Plaintiff does not allege that the Company is not, in fact, seeking to develop a digital X-ray source that addresses the drawbacks of existing X-ray tube technology. For example, Plaintiff does not dispute that the Company expects its digital, semiconductor-based X-ray tube will be substantially smaller and require less heat than legacy X-ray tubes.[5]

The Company also never stated that its system could "replace the CT" or that it had the same capabilities. To the contrary, the Company clearly disclosed, on the first page of its IPO registration statement and in numerous subsequent public statements, that "[s]ubject to receiving regulatory clearance, the first version of the **Nanox.ARC** that [the Company] expect[s] to

---

[5] Plaintiff also quotes a statement that the Company's X-ray source is based on technology "we believe can achieve the same functionalities as legacy X-ray analog cathodes." (Compl. ¶ 66.) In response to Defendants' Pre-Motion Conference Letter, (ECF No. 31 at 1), Plaintiff seemed to confuse this statement, which concerns the promise for the Company's underlying technology, as a statement regarding the capability of the Nanox.ARC. In any event, Defendants did not represent that its technology had already achieved the same functionalities of legacy X-ray sources, only that it believed that level of functionality could be achieved. And Plaintiff has not alleged any basis for asserting the Company's opinion regarding the technology was false. (*See infra* Section II.D.)

introduce to the market will be a ***three-dimensional tomosynthesis imaging system***," not a CT system.[6] (Ex. 1 at 1; *see also* Ex. 9 at 5 ("Now Nanox.ARC, ***the product is a 3D tomosynthesis full-body imaging system* . . .**").) Plaintiff itself alleges that the Nanox.ARC is intended to be a tomosynthesis imaging system that uses X-ray images from a small number of angles (Compl. ¶ 50), and that a CT scanner takes "hundreds to thousands of images" that can "build[] a full 3D representation, which tomosynthesis cannot do" (*id.*).

The context of the Company's disclosures also make clear that Defendants never claimed the Nanox.ARC would have the same capabilities as, or was intended to replace CT scanners. Rather, Nanox repeatedly explained its goal was to expand the medical imaging market by designing a tomosynthesis-based device that would be more accessible and affordable to allow for diagnostic imaging in places currently without access to imaging due to the cost and complexity of currently available imaging systems. (*See* Ex. 1 at 1 ("[W]e at Nanox are focused on . . . mak[ing] diagnostic medicine more accessible and affordable across the globe"); *see id.* at 2, 80 ("A lower cost device has the potential to substantially increase medical imaging availability and improve accessibility of early-detection services broadly across the globe.").)

In claiming that the "import" of these statements was somehow misleading, Plaintiff fares no better. The "[f]ederal securities laws are designed to promote the disclosure of facts. The importance of disclosed facts, and any 'characterizations of or conclusions drawn from those facts[,] are matters that are left to the judgment of investors.'" *Silsby v. Icahn*, 17 F. Supp. 3d 348, 361-62 (S.D.N.Y. 2014) (second alteration in original) (citation omitted), *aff'd sub*

---

[6] Plaintiff confusingly argued in its Pre-Motion Conference response letter that the reference to "the first version *of the Nanox.ARC* that [the Company] expect[s] to introduce to the market" was a reference to it's the single-source system. (ECF No. 31 at 2.) This is a not credible reading, however. In the same disclosure, a mere two paragraphs away, the Company stated the multi-source Nanox.ARC will be its ***commercial imaging system***. (Ex. 1 at 85.)

*nom. Lucas v. Icahn*, 616 F. App'x 448 (2d Cir. 2015). The difference between tomosynthesis imaging and CT scans was obvious to Plaintiff, as evidenced by its own allegations, and would have been obvious to other investors as well. *See, e.g.*, *Tomosynthesis*, Wikipedia: The Free Encyclopedia (June 29, 2022), https://en.wikipedia.org/wiki/Tomosynthesis; *Emerson v. Mut. Fund Series Tr.*, 393 F. Supp. 3d 220, 249 (E.D.N.Y. 2019) ("[D]isclosure requirements are not intended to attribute to investors a child-like simplicity. Rather, investors are presumed to have the ability to be able to digest varying reports and data." (citation omitted)). Even if Plaintiff did not understand the difference between tomosynthesis and CT scanning, the federal securities laws create liability for "*misleading* statements, not statements that an investor simply misunderstood." *Id.*

Lastly, Plaintiff alleges that, because the Nanox.ARC is a tomosynthesis system, it will lack the image resolution and clarity capability of a CT scanner. (Compl. ¶ 49.) If Plaintiff is suggesting Nanox had some duty to disparage its system in comparison to others, it is well established that the Company had no such obligation. *See Portannese v. Donna Karan Int'l, Inc.*, No. 97-CV-2011 CBA, 1998 WL 637547, at *13 (E.D.N.Y. Aug. 14, 1998) ("[A] company has no duty to disparage its own competitive position in the market where it has provided accurate hard data from which analysts and investors can draw their own conclusions about the company's condition and the value of its stock." (citation omitted)).

**C.  The Allegedly False and Misleading Statements Are Protected by the PSLRA Safe Harbor and the Bespeaks Caution Doctrine**

In any event, the statements Plaintiff claims were misleading, (Compl. ¶¶ 66-96), are forward-looking statements protected from liability under the PSLRA's safe harbor, 15 U.S.C. § 78u-5, and the bespeaks caution doctrine. Under the safe harbor, a defendant "shall not be liable with respect to any forward-looking statement if (1) the forward-looking statement is identified

13

as such and accompanied by meaningful cautionary statements, or (2) the forward-looking statement is immaterial, or (3) the plaintiff fails to prove that the forward-looking statement . . . if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading." *In re Fed Ex Corp. Sec. Litig.*, 517 F. Supp. 3d 216, 232 (S.D.N.Y. 2021). "Because that provision is written in the disjunctive, 'a defendant is not liable if the forward-looking statement is identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading.'" *In re Bemis Co. Sec. Litig.*, 512 F. Supp. 3d 518, 531 (S.D.N.Y. 2021) (quoting *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010)).

Apart from the safe harbor, under the bespeaks caution doctrine, forward-looking statements are "immaterial as a matter of law because it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language" accompanying the statements. *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002).

Here, the cost estimate statements are plainly forward looking. Plaintiff points to statements about the Company's "*plan* to market and deploy the Nanox System globally at a substantially lower cost," the Company's "*belief*" that the technology would allow them to "manufacture the Nanox.ARC, if cleared, at substantially lower costs," and Nanox's then-current *estimates* of an aggregate cost of "approximately $8,000 to $12,000 per unit, assuming at least 15,000 Nanox.ARC units will be manufactured." (*See*, *e.g.*, Compl. ¶¶ 66, 68, 70, 84, 86, 91 (emphasis added).) "[A] statement that projects results in the future is plainly forward looking, and need not be specifically labeled as forward-looking or segregated into a separate section to qualify for safe-harbor protection." *In re Nokia Corp. Sec. Litig.*, No. 19-CV-3509, 2021 WL 1199030, at *19 (S.D.N.Y. Mar. 29, 2021) (alteration in original) (citation omitted). "[W]ords

14

such as 'expect' identify forward-looking statements." *In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d 358, 375 (S.D.N.Y. 2018) (citation omitted). Production cost estimates are quintessential forward-looking statements. *See id.* (statements regarding the gold expected to be produced from a mine and costs of production were "projections of 'other financial items' and 'statement[s] of future economic performance' falling with[in] the statutory definition of 'forward-looking statement.'") (alteration in original) (quoting 15 U.S.C. § 78u-5(i)(1)(A), (C).)

The statements Plaintiff alleges were misleading comparisons between the Nanox.ARC and CT scanners are also forward-looking because they speak to the Company's expectations for its system. Indeed, in the Company's IPO and SPO Registration Statements, statements regarding the Company's "ability to manufacture the Nanox.ARC, if cleared, at substantially lower costs compared to medical imaging systems that use a legacy analog X-ray source" were specifically identified as forward-looking. (*See* Ex. 1 at 55; Ex. 4 at 59.)

All of these statements were accompanied by meaningful cautionary language explaining that results could differ and specifically covering the risks that Plaintiff now claims were not disclosed, including that the Company may not be able to develop the Nanox.ARC at the estimated costs. (*See supra* at 5-6.) Accordingly, the statements are not actionable under both the PSLRA safe harbor and the bespeaks caution doctrine. *See Fed Ex Corp.*, 517 F. Supp. 3d at 233-34, 239 (dismissing complaint where cautionary language warned of the precise risks about which plaintiff complained); *accord In re Bemis*, 512 F. Supp. 3d at 532-33 (same); *In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 310 (S.D.N.Y. 2021) (same (citation omitted)); *In re Initial Pub. Offering Sec. Litig.*, 383 F. Supp. 2d 566, 582-83 (statements in IPO prospectus concerning the factors taken into account in pricing protected by the bespeaks caution doctrine), *opinion supplemented on reconsideration*, 399 F. Supp. 2d 261 (S.D.N.Y 2005), *aff'd sub nom.*

15

*Tenney v. Credit Suisse First Bos. Corp.*, 2006 WL 1423785 (2d Cir. May 19, 2006).[7]

Even if the Defendants' statements had not been accompanied by cautionary language, they would still fall within the safe harbor because Plaintiff has failed to make any allegations whatsoever that these statements were made with actual knowledge of their falsity—a high bar that is "stricter than for statements of current fact" and requires "knowing falsity." *Fed Ex*, 517 F. Supp. 3d at 233 (quoting *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 773 (2d Cir. 2010)). As discussed in Sections II.A. and II.B., above, Plaintiff has not even demonstrated that these statements *are* false, much less that anyone at the Company knew them to be false when they were made. As such, the claims should be dismissed.[8]

### D.     Opinion Statements Are Not Actionable

Plaintiff must identify a false or misleading statement of *fact*. An opinion statement can only be actionable as a false statement of fact if the opinion was not honestly held, if the statement's supporting facts are untrue, or the statement fails to disclose facts and such failures makes the opinion statement misleading. *See Omnicare*, 575 U.S. at 184-86, 188-91.

Here, many of the statements Plaintiff alleges are misleading are opinions. (*See*, *e.g.*, Compl. ¶¶ 66, 84 ("Our X-ray source is based on a novel digital microelectromechanical system ("MEMs") semiconductor cathode that **we believe** can achieve the same functionalities as legacy

---

[7] The statutory safe harbor does not apply to statements made in connection with an IPO. *See* 15 U.S. Code § 78u–5(b)(2)(D). Neither Lead Plaintiff nor the initial plaintiff alleged they purchased their shares in the Company's IPO. (ECF Nos. 1, 12-4.) Nevertheless, if Plaintiff attempts to invoke that exception, it would not save its claims because the bespeaks caution doctrine does apply to statements made in connection with an IPO. *See Initial Pub. Offering*, 383 F. Supp. 2d at 575-76, 582-83.

[8] Oral statements are also protected by the safe harbor where, as here, the statements are accompanied by the requisite cautionary language. *See* 15 U.S.C. 78u-5(c)(1)(A)(i); *see also In re Avon Prods., Inc. Sec. Litig.*, No. 05 Civ. 6803 (LAK) (MHD), 2009 WL 848017, at *18 (S.D.N.Y. Feb. 23, 2009), *report and recommendation adopted*, No. 05 Civ. 06803 (LAK), 2009 WL 10698359 (S.D.N.Y. Mar. 18, 2009). The statements challenged in paragraphs 68, 70, 80, 82, 86, 88, 93 and 95 of the Complaint were all accompanied by the requisite cautionary language and are thus protected. (*See* Exs. 3; 7-15.)

X-ray analog cathodes, while allowing for lower-cost production than existing medical imaging systems. . . . *We believe* our digital X-ray source technology will allow us to manufacture the Nanox.ARC, if cleared, at substantially lower costs compared to medical imaging systems that use a legacy analog X-ray source without sacrificing imaging quality. . . . *We currently estimate* the aggregate cost of purchasing and assembling the components of the Nanox.ARC will be approximately $8,000 to $12,000 per unit, assuming at least 15,000 Nanox.ARC units will be manufactured." (emphasis added)); *id.* ¶ 80 ("[*W*]*e believe* that once we completed the transfer for mass production, we can actually place those light bulbs, in a way, in different systems around the world and by that increase the accessibility to medical imaging." (emphasis added)).)

The Complaint does not contain a single factual allegation that even attempts to show that Defendants did not believe their statements of opinion when made. Accordingly, these opinion statements are not actionable under the first prong of *Omnicare*. *See Woolgar v. Kingstone Cos., Inc.*, 477 F. Supp. 3d 193, 224 (S.D.N.Y. 2020) ("Plaintiff fails to sufficiently allege that the loss reserve estimates were false at the time they were made, or that Defendants did not honestly believe those estimates to be true and accurate.").

Plaintiff's claims also fail under the second prong of *Omnicare* because Plaintiff does not allege particular and material facts that Defendants omitted to state which would render the challenged opinion statements misleading. "To claim that the Company omitted information that made a statement of opinion misleading, '[t]he investor must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.'" *Tongue*, 816 F.3d at 209 (alteration in original) (quoting *Omnicare*, 575 U.S. at 194). Courts have

17

"cautioned against an overly expansive reading of this standard, noting that '[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts,' and adding that '[a] reasonable investor does not expect that every fact known to an issuer supports its opinion statement.' . . . [A] statement of opinion 'is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way.'" *Id.* at 210 (alterations in original) (quoting *Omnicare*, 575 U.S. at 189-90). As discussed in Section II.A., Plaintiff does not allege any *facts* at all. Instead, Plaintiff makes vague, conclusory allegations regarding the cost of equipment, without explaining its relevance to the commercial product that is the subject of the statements of opinion. As a result, these opinion statements are not actionable.

**E.     General Statements of Puffery and Expressions of Corporate Optimism Are Not Actionable**

Many of the statements identified in the Complaint are statements of enthusiasm of the type courts have repeatedly found to be non-actionable. (*See* Compl. ¶¶ 66, 68, 88.) "[E]xpressions of puffery and corporate optimism do not give rise to securities violations," *Rombach*, 355 F.3d at 174, because they are not material. Defendants' statements describing the Company's technology as "novel," a "game-changer" or taking the technology "generations forward," for example, are clearly not actionable. *See In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 523-24 (S.D.N.Y. 2020) ("[DirecTV Now] . . . we think will be a real game changer" was nonactionable puffery) (citation omitted)), *appeal docketed*, No. 21-2698 (2d Cir. Oct. 27, 2021).

**F.     Plaintiff Fails to Plead a Violation of Regulation S-K**

Plaintiff's Item 303 and 105 allegations fare no better. To start, Plaintiff does not even allege a trend, risk or uncertainty as required, but rather a misrepresentation of present fact. (*See* Compl. ¶¶ 63-64.) Regardless, Plaintiff has failed to allege falsity, let alone that Defendants had

18

knowledge that their statements were false or misleading. (*See supra* at 8-13.) At the very most, Plaintiff alleges Defendants should have known about the alleged "trends" or "risks," which is plainly insufficient. *Cf. Medina v. Tremor Video, Inc.*, 640 F. App'x 45, 48 (2d Cir. 2016) (affirming denial of leave to file proposed amended complaint that alleged that "publicly available information made [the trends and uncertainties] 'apparent'" and otherwise alleged "only suppositions of what defendants 'would have' known or were 'in a position to know,'" but did not assert what defendants actually knew).

## III. PLAINTIFF FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER

Plaintiff's claims should also be dismissed for the independent reason that the Complaint fails to allege a strong inference of scienter. The required "strong inference" of scienter "must be 'more than merely plausible or reasonable–it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent,'" and a court must consider any "competing inferences rationally drawn from all the facts alleged, taken collectively." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007)).

Scienter may be pled through particularized factual allegations showing "either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* None of Plaintiff's allegations, alone or together, raise a strong inference of scienter.

The Complaint does not purport to identify any of Defendants' motive to defraud investors, *i.e.*, "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001).

Absent motive allegations, Plaintiff's allegations of conscious misbehavior or recklessness "must be correspondingly greater." *ECA*, 553 F.3d at 198-99 (quoting *Kalnit*, 264

19

F.3d at 142). "The standard for pleading scienter in this manner is stringent and subject to the heightened pleading standard of the PSLRA." *Chapman v. Mueller Water Prods., Inc.*, 466 F. Supp. 3d 382, 413 (S.D.N.Y. 2020) (citing 15 U.S.C. § 78u-3(b)(2)(A)). "Recklessness in this context means 'a state of mind approximating actual intent, and not merely a heightened form of negligence.'" *In re Alkermes Pub. Ltd. Co. Sec. Litig.*, 523 F. Supp. 3d 283, 292 (E.D.N.Y. 2021) (quoting *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009)), *aff'd sub nom. Midwest Operating Eng'rs Pension Tr. Fund v. Alkermes Pub. Ltd. Co.*, No. 21-801-cv, 2021 WL 5782079 (2d Cir. Dec. 7, 2021). To meet this standard, Plaintiff must "allege facts approaching *a knowledgeable participation in the fraud or a deliberate and conscious disregard of facts*." *In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d 405, 415 (S.D.N.Y. 2007) (citation omitted); *aff'd sub nom. S. Cherry St., LLC v. Hennessee Grp. LLC,* 573 F.3d 98 (2d Cir. 2009).

At a high level, Plaintiff's theory is that the Defendants invested, and continue to invest substantial sums, in technology they knew was too costly and lacks the capability to ever meet the expectations they professed, and then sought to mislead investors through a scheme so poorly constructed Plaintiff was able to uncover it with internet searches. Such an economically illogical fraud is neither cogent nor at least as compelling as the opposing inference that Defendants made the at-issue statements concerning the expected development and price of the Nanox.ARC based on the best information available to them at the time. *See ECA*, 553 F.3d at 198.

The allegations Plaintiff proffers in support of scienter do not improve the picture. Although there are numerous sub-headings in the Complaint's scienter section, each is merely a repackaged version of the same argument—that Defendants had knowledge of their statements' falsity when they were made. But to allege scienter based on Defendants' knowledge, Plaintiff "must 'specifically allege[ ] defendants' knowledge of facts or access to information contradicting

20

their public statements.'" *Canez v. Intelligent Sys. Corp.*, No. 19-CV-3949 (RPK)(CLP), 2021 WL 3667012, at *10 (E.D.N.Y. Aug. 18, 2021) (Kovner, J.) (alteration in original) (quoting *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)). And Plaintiff must specify exactly what knowledge Defendants had, and "specifically identify the reports or statements containing [that] information." *Shetty v. Trivago N.V.*, 796 F. App'x 31, 35 (2d Cir. 2019) (quoting *Novak*, 216 F.3d at 309); *see also Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 588 (S.D.N.Y. 2011) (Plaintiff must adequately plead facts connecting Defendants to "*specific* contradictory information" available to each "*at the same time* they made their [allegedly] misleading statements" (citation omitted)).

Plaintiff fails to allege any such knowledge. First, Plaintiff claims that the Individual Defendants had knowledge by virtue of their positions at the Company. (*See* Compl. ¶¶ 102-104.) "[I]t is well established" that simply citing "a defendant's position does not, without more, support a conclusion that the defendant had access to information contradicting an alleged misrepresentation." *Marcu v. Cheetah Mobile Inc.*, No. 18-CV-11184 (JMF), 2020 WL 4016645, at *7 (S.D.N.Y. July 16, 2020).[9]

Second, Plaintiff alleges that Defendants' repeated statements that (1) "the Nanox.ARC is 'substantially lower cost compared to currently available medical imaging systems, such as computed tomography ("CT"),' and (2) the estimate aggregate cost of the Nanox.ARC is either around $10,000, or in the range of $8,000 to $12,000" support an inference of scienter. (Compl. ¶¶ 105-110.) But Plaintiff does not allege any contrary facts known by Defendants, and without

---

[9] With respect to Mr. Maayan, this is the sole allegation related to scienter—other than his position as Chief Financial Officer and his signing of SEC filings, he is not alleged to have (1) made any of the allegedly misleading statements or (2) received any information as CFO providing insight into the component costs or capabilities of the Nanox.ARC.

that, Defendants' repetition of accurate statements does not support an inference of scienter. *See Prime Mover Cap. Partners, L.P. v. Elixir Gaming Techs., Inc.*, 793 F. Supp. 2d 651, 668 (S.D.N.Y. 2011) (dismissing claims where "Plaintiff's *scienter* allegations consist primarily of bald assertions that the defendants knew, or should have known, that they had no basis for asserting the expected $125 average net win figure").

Third, Plaintiff makes a series of conclusory claims that purportedly support the notion that Defendants "must have known" that the cost estimates were not accurate and the Nanox.ARC could not be compared to a CT scanner, including that: (1) in preparing to respond to a question from the SEC in 2019, Defendants "must have become aware" that the cost estimates were inaccurate and that the Nanox system could not be compared to a CT scanner (*see* Compl. ¶¶ 111-114); (2) Defendants made representations about the cost of the Nanox.ARC "in (sic) at least thirteen different occasions" (*see id.* ¶¶ 115-117); (3) the Company has pushed back shipment of the first 1,000 Nanox.ARC units (*see id.* ¶¶ 124-135); and (4) the Company ceased making statements about the cost of the Nanox.ARC after announcing receipt of the SEC subpoena (*see id.* ¶¶ 136-141). Put simply, none of these allegations are sufficient to plead scienter because they do not point to any specific documents or reports containing information contrary to the at-issue statements. *See Shetty*, 796 F. App'x at 35.

Fourth, Plaintiff claims "Defendants' failure to disclose information that they had a clear duty to disclose supports an inference of scienter," arguing Defendants had an affirmative duty to disclose the (Plaintiff-calculated) higher costs for assembling the Nanox.ARC and (Plaintiff's view) that the Nanox.ARC was not comparable to existing CT imaging under Items 105 and 303 of Regulation S-K, 17 C.F.R. §§ 229.105, 229.303. (*See* Compl. ¶¶ 122-123.) However, as discussed in Section II.F., *supra*, "Plaintiff[] must demonstrate actual knowledge of an existing

trend, event, or risk to allege violations of Section 303 and 105." *In re HEXO Corp.*, 524 F. Supp. 3d at 302 (citation omitted). Again, Plaintiff has failed to make *any* allegations of specific knowledge on the part of the Defendants, and cannot circularly argue that a purported violation of Regulation S-K, which requires actual knowledge, supports an inference of scienter.

Finally, Plaintiff claims that the "core operations theory" supports an inference of scienter. (*See* Compl. ¶¶ 118-121.) However, it is not "clear [the core operations] theory . . . survived the passage of the PSLRA." *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 163 n.10 (S.D.N.Y. 2015). Even if it did, "the 'core operations theory' at most constitutes 'supplemental support' for alleging scienter but does not independently establish scienter." *Id.* at 163 (citation omitted). Because all of Plaintiff's other purported scienter allegations fail, the core operations theory cannot save the Complaint.

## IV. PLAINTIFF FAILS TO PLEAD LOSS CAUSATION

Plaintiff's claims fail for the additional, independent reason that they do not plead loss causation. "[T]o establish loss causation, 'a plaintiff must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered,' *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) (second alteration in original) (citation omitted). Plaintiff contends that its losses were caused by two purported corrective disclosures: the Company's November 17, 2021 press release on Form 6-K disclosing the SEC subpoena and a November 18, 2021 Oppenheimer Equity Research report commenting on that disclosure. (*See* Compl. ¶¶ 97-101.) These corrective disclosures fail as a matter of law.

To start, neither of Plaintiff's purported corrective disclosures "correct" or reveal undisclosed facts regarding Defendants' statements that purportedly inappropriately compare the

Nanox.ARC to CT scanners. Indeed, it makes sense that Plaintiff is unable to identify a corrective disclosure on this theory because, as discussed above, the expected capabilities of the Nanox.ARC were disclosed to the market on numerous occasions. *See In re New Energy Sys. Sec. Litig.*, 66 F. Supp. 3d 401, 405 (S.D.N.Y. 2014) ("'[W]hen elements of the alleged "concealed risk" were exposed to the market,' the Complaint alleges no market reaction whatsoever." (citation omitted)); *see also Dalberth v. Xerox Corp.*, 766 F.3d 172, 188 (2d Cir. 2014) (no loss causation where "sufficient disclosures [were] made prior to either of the claimed corrective disclosure dates").

With respect to the accuracy of the cost estimates, the Company's Form 6-K is not a corrective disclosure because it did not reveal anything about whether the Company's prior cost estimate disclosures were accurate. "The announcement of an SEC subpoena or an internal investigation is itself insufficient to plead loss causation." *Janbay v. Canadian Solar, Inc.*, No. 10 Civ. 4430 (RWS), 2012 WL 1080306, at *15 (S.D.N.Y. Mar. 30, 2012); *see also Meyer v. Greene*, 710 F.3d 1189, 1201 (11th Cir. 2013) ("The announcement of an investigation reveals just that—an investigation—and nothing more."). While there may be a corresponding stock drop attributable to uncertainty following disclosure of an investigation, "[t]hat does not mean that the investigations, in and of themselves, reveal to the market that a company's previous statements were false or fraudulent." *Meyer*, 710 F.3d at 1201.

The Oppenheimer Report is not a corrective disclosure because "third-party articles and reports express[ing] negative *opinions* . . . based on information that was already publicly available" are "not 'corrective' for the purpose of pleading loss causation." *Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72, 75 (2d Cir. 2013).

## V. PLAINTIFF'S RULE 10B-5(A) AND (C) CLAIMS SHOULD BE DISMISSED

The Complaint mimics the language of Rule 10b-5(a) and (c), 17 C.F.R. § 240.10b-5(a),

(c), but does not assert a separate "scheme" liability count. (Compl. ¶ 158.) Plaintiff's claim that Defendants made misrepresentations or omissions, even if adequately pleaded, would not suffice to plead scheme liability. *See SEC v. Rio Tinto plc*, No. 21-2042, 2022 WL 2760323, at *1 (2d Cir. July 15, 2022). The scheme liability allegations should be dismissed because Plaintiff does not "articulate with precision the contours of an alleged scheme to defraud investors" or any "specific acts . . . conducted in furtherance of it." *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021). Merely incorporating the previous pages of the Complaint "paired with . . . conclusory assertion[s]," as Plaintiff has done, is not enough. *Id.*

## VI. PLAINTIFF'S SECTION 20(A) CLAIMS SHOULD BE DISMISSED

The control person claims under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), fail for at least three reasons. First, Plaintiff fails to plead any primary liability under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), which is fatal under Section 20(a). *See Kalnit v. Eichler*, 85 F. Supp. 2d 232, 246 (S.D.N.Y. 1999). Second, Plaintiff purports to plead primary and control person liability as to the same defendants for the same conduct (Compl. ¶¶ 142-45), which it is not permitted to do. *See id*. Finally, Plaintiff fails to allege how the Individual Defendants controlled any violation other than through their Company positions (Compl. ¶¶ 142-45), which is insufficient to plead control person liability. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd*., 493 F.3d 87, 108 (2d Cir. 2007) (Section 20(a) requires pleading each "defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud").

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.[10]

---

[10] "'No amount of detail can save [a] complaint when,' as in this case, 'the detail is based on flawed and unreasonable methodologies that lead to unsupported conclusions.'" *Livingston v. Cablevision Sys. Corp.*, 966 F. Supp. 2d 208, 222 (E.D.N.Y. 2013) (alteration in original) (citation omitted).

Dated: New York, New York
July 25, 2022

Respectfully submitted,

SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP

  /s/ *Christopher P. Malloy*
Christopher P. Malloy
Susan L. Saltzstein
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
christopher.malloy@skadden.com
susan.saltzstein@skadden.com

*Attorneys for Nano-X Imaging Ltd.*

Jeffrey J Chapman
Stephen G. Foresta
MCGUIRE WOODS LLP
1251 Avenue of the Americas
20th Floor
New York New York 10020
Telephone: (212) 548-7060
jchapman@mcguirewoods.com
sforesta@mcguirewoods.com

*Attorneys for Ran Poliakine*

Hadar E. Israeli (pro hac vice forthcoming)
Haguy E. Kessel
58 Harakevet St., 21st Floor
Tel Aviv, Israel
Telephone: +972-3-6400600
Fax: +972-3-6400650
hisraeli@barlaw.co.il
hkessel@barlaw.co.il

*Attorneys for Itzhak Maayan*

26